# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2015-DR-01373-SCT

*TIMOTHY ROBERT RONK a/k/a TIMOTHY RONK*
*a/k/a TIMOTHY R. RONK*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/08/2010 |
| TRIAL JUDGE: | HON. LISA P. DODSON |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF CAPITAL POST-CONVICTION COUNSEL |
| | BY: ALEXANDER DUNLAP MOORHEAD KASSOFF |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BRAD ALAN SMITH |
| NATURE OF THE CASE: | CIVIL - DEATH PENALTY - POST CONVICTION |
| DISPOSITION: | LEAVE TO SEEK POST-CONVICTION RELIEF DENIED - 01/17/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**WALLER, CHIEF JUSTICE, FOR THE COURT:**

¶1.    Timothy Ronk was convicted of capital murder and armed robbery. ***Ronk v. State***, 172 So. 3d 1112, 1121 (Miss. 2015). He was sentenced to death and thirty years in prison, respectively. ***Id.*** We affirmed his convictions and sentences. ***Id.***

¶2.    Ronk now moves for leave to seek post-conviction relief in the trial court, raising five claims: (1) trial counsel was ineffective; (2) his sentence was disproportionate;

(3) Mississippi's death-penalty statute is unconstitutional; (4) cumulative error requires reversal; and (5) trial counsel failed to preserve the record for review.

¶3. We find that Ronk's claims are either barred or fail to present a substantial showing of the denial of a state or federal right; therefore, the motion is denied.

## FACTS AND PROCEDURAL HISTORY

¶4. On the morning of August 26, 2008, emergency crews responded to a house fire in Biloxi, Mississippi. *Id.* In extinguishing the fire, they found Michelle Lynn Craite's remains in the master bedroom. *Id.* at 1121–22. An autopsy showed multiple stab wounds to her back; severe burns that "destroyed her flesh down to the bone"; and "blistering and burning to the lining of her mouth, tongue, larynx, and windpipe." *Id.* at 1121. Her blood also had a high level of carbon monoxide. *Id.* Evidence thus indicated that she had been alive and breathing during the fire. *Id.* A forensic pathologist said that the stab wounds not only were likely the cause of her death, but also that they incapacitated her by preventing her escape from the fire. *Id.*

¶5. Authorities determined the fire had been set intentionally, with gasoline vapors as the ignition source. *Id.* at 1122. They also learned that Ronk had been living there. *Id.* At the time, he was on house arrest, having been convicted of grand larceny weeks earlier. *Id.* at 1147.

¶6. Bank records showed that the morning Craite died, someone had used her debit card at a Walmart in D'Iberville, Mississippi, to withdraw $500 from the ATM and to purchase more than $400 in jewelry. *Id.* at 1122. Surveillance footage showed that it was Ronk. *Id.*

2

And the Walmart's manager identified Ronk as the person who had bought a ring that morning. *Id.* at 1122–23.

¶7. Authorities also learned that Ronk had used one of Craite's cell phones. *Id.* at 1123. Phone records showed frequent calls to Florida resident Heather Hindall. *Id.* The morning of Craite's death, Ronk had texted Hindall that he was "loading up and coming to Florida." *Id.*

¶8. Authorities arrested Ronk in Florida and spoke to Hindall. *Id.* She said she had met him online. *Id.* She knew he had a "roommate," but believed he was planning to move to Florida and marry her. *Id.* The evening of August 26, 2008, he had arrived in Florida and proposed to her with the ring he had bought at Walmart. *Id.*

¶9. After his arrest, Ronk told Hindall what had happened with Craite. *Id.* He said they began arguing when he tried to leave for Florida. *Id.* She tried to attack him with a knife. *Id.* He disarmed her, however, and then stabbed her when she threatened to get a shotgun and kill him. *Id.* Afterwards, he poured gasoline on everything, set a fire, drove away, and threw the knife over a bridge. *Id.* Ronk later confirmed that story in a letter to Hindall. *Id.*

¶10. Ronk was indicted for armed robbery and capital murder with arson as the underlying felony. *Id.* at 1124. A jury convicted him of both charges. *Id.* Following a sentencing hearing, the jury sentenced Ronk to death for capital murder, finding that the mitigating circumstances did not outweigh the aggravating circumstances: that the offense (a) "was committed while [Ronk] was engaged in the commission of [a]rson"; (b) "was committed by

3

a person under sentence of imprisonment"; and (c) "was especially heinous, atrocious, or cruel." *Id.* For the armed robbery, the trial court sentenced Ronk to thirty years. *Id.*

¶11.   We affirmed the convictions and sentences, *id.* at 1149, and the mandate issued September 24, 2015.

¶12.   On September 23, 2016, Ronk filed this motion for leave to seek post-conviction relief in the trial court, raising five issues:

   (1)   [He] was denied his constitutional right to effective assistance of counsel.

   (2)   A review of cases with facts meaningfully similar to [his] case dispels the notion that [his] sentence was not "disproportionate to the penalty imposed in similar cases."

   (3)   Mississippi's death[-]penalty statute is unconstitutional because it is arbitrarily and capriciously applied.

   (4)   Cumulative error

   (5)   Trial counsel failed to preserve the record for review.

Ronk also says he must file a supplement. He did so, rendering that issue moot. And in his rebuttal, he asks this Court to address issues concerning right of access to experts and litigation expenses. We decline to do so. The trial court ruled on those issues before Ronk filed this motion, and neither party sought relief.

**ANALYSIS**

¶13.   When a conviction and sentence have been affirmed on appeal, the petitioner must seek and obtain leave from this Court before seeking relief in the trial court. Miss. Code Ann. § 99-39-7 (Rev. 2015). Leave is granted only if the application, motion, exhibits, and prior record show that the claims are not procedurally barred and that they "present a substantial

4

showing of the denial of a state or federal right." Miss. Code. Ann. § 99-39-27(5) (Rev. 2015). Well-pleaded allegations are accepted as true. *Simon v. State*, 857 So. 2d 668, 678 (Miss. 2003) (citing *Moore v. Ruth*, 556 So. 2d 1059, 1061–62 (Miss. 1990)).

¶14. In capital cases, non-procedurally barred claims are reviewed using "'heightened scrutiny' under which all bona fide doubts are resolved in favor of the accused." *Crawford v. State*, 218 So. 3d 1142, 1150 (Miss. 2016) (quoting *Chamberlin v. State*, 55 So. 3d 1046, 1049–50 (Miss. 2010)). "[W]hat may be harmless error in a case with less at stake becomes reversible error when the penalty is death." *Crawford*, 218 So. 3d at 1150 (quoting *Chamberlin*, 55 So. 3d at 1049–50).

¶15. While the parties argue somewhat about the proper standard of review, *Neal v. State* explains that

> Section 99-39-9 suggest[s] a regime of sworn, fact pleadings, based upon personal knowledge. The Court upon examination of the application has the authority to dismiss it outright,
>
> > if it plainly appears from the face of the motion, any annexed exhibits and the prior proceedings in the case that the movant is not entitled to any relief. . . .
>
> On the other hand, if the application meets the[] pleading requirements and presents a claim procedurally alive "substantial[ly] showing denial of a state or federal right," the petitioner is entitled to an in[-]court opportunity to prove his claims.

*Neal v. State*, 525 So. 2d 1279, 1280–81 (Miss. 1987) (footnote, citation, and internal citation omitted).

**I.    Ronk fails to present a substantial showing that he was denied effective assistance of counsel.**

¶16.    Criminal defendants are entitled to effective assistance of counsel. *E.g. Read v. State*, 430 So. 2d 832, 837 (Miss. 1983) (citations omitted). To prove counsel was ineffective, defendants (or here, petitioners) must meet a two-part test. *Doss v. State*, 19 So. 3d 690, 694–95 (Miss. 2009) (quoting *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).

¶17.    First, petitioners must show that counsel's performance was deficient, i.e., "counsel's representation 'fell below an objective standard of reasonableness.'" *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S. Ct. 2527, 2535, 156 L. Ed. 2d 471 (2003) (quoting *Strickland*, 466 U.S. at 688). "Reasonableness" is based on "prevailing professional norms." *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 688). "Prevailing norms of practice as reflected in American Bar Association [(ABA)] standards and the like . . . are guides to determining what is reasonable." *Strickland*, 466 U.S. at 688. But those standards are only guides. *Bobby v. Van Hook*, 558 U.S. 4, 8, 130 S. Ct. 13, 17, 175 L. Ed. 2d 255 (2009) (quoting *Strickland*, 466 U.S. at 688) ("'[ABA] standards and the like' are 'only guides' to what reasonableness means, not its definition."). "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Strickland*, 466 U.S. at 688–89.

¶18.    In assessing counsel's performance, courts must be "highly deferential," making "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the

circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Bell v. Cone*, 535 U.S. 685, 698, 122 S. Ct. 1843, 1852, 152 L. Ed. 2d 914 (2002) (quoting *Strickland*, 466 U.S. at 689). A strong presumption exists that counsel's conduct "fell within the wide range of reasonable professional assistance." *Ross v. State*, 954 So. 2d 968, 1004 (Miss. 2007) (citing *Howard v. State*, 853 So. 2d 781, 796 (Miss. 2003)). At the same time, lapses "must be viewed in light of the nature and seriousness of the charges and the potential penalty." *Ross*, 954 So. 2d at 1004 (citing *State v. Tokman*, 564 So. 2d 1339, 1343 (Miss. 1990)).

¶19.    Second, if deficient performance is shown, petitioners must show that the deficiency prejudiced their defense, i.e., "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Doss*, 19 So. 3d at 695 (quoting *Strickland*, 466 U.S. at 687). To do so, they "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Doss*, 19 So. 3d at 695 (quoting *Strickland*, 466 U.S. at 694). Put differently, "there must be '[a] reasonable probability that at least one juror would have struck a different balance.'" *Isham v. State*, 161 So. 3d 1076, 1089 (Miss. 2015) (quoting *Davis v. State*, 87 So. 3d 465, 474 (Miss. 2012)).

¶20.    Here, Gordon Eric Geiss served as lead trial counsel. Other counsel were Charles Stewart, Dawn Stough, and Matthew Busby. Ronk argues that counsel, through Geiss, were ineffective both at the sentencing phase and at the guilt phase.

7

¶21.  Before addressing the substance of Ronk's ineffective-assistance claim, we must first determine if it is procedurally barred. He says it is not, because he raised ineffective assistance on direct appeal, and we dismissed the claim without prejudice to his right to raise it in post-conviction proceedings.

¶22.  On direct appeal, Ronk argued that trial counsel was ineffective at sentencing in four ways: (1) "his attorney suffered from significant medical problems throughout the course of his representation . . . , impeding his performance and perhaps his judgment"; (2) "his attorney enlisted the assistance of an expert witness who was not equipped to perform a mitigation study in a capital case and who presented inadmissible prejudicial evidence to the jury"; (3) "counsel impermissibly failed to request jury instructions on statutory mitigating factors supporting the defense's mitigation theory"; and (4) "his attorney made a prejudicially inadequate closing argument at the completion of the sentencing phase . . . ." *Ronk*, 172 So. 3d at 1130–31. We indeed dismissed his ineffective-assistance claim without prejudice to his right to raise it properly in post-conviction proceedings. *Id.* at 1131.

¶23.  The State concedes the claim is not barred as to "his issues with counsel's medical problems; enlistment and examination of [the expert witness] during sentencing; and counsel's opening and closing arguments." Yet his claim here includes another issue. In addition to the ineffective-assistance grounds raised on direct appeal, he now adds a new ground: he claims counsel was ineffective during the guilt phase too.

¶24.  Authority conflicts about whether the new ground should be procedurally barred. *Goodin v. State*, 856 So. 2d 267, 279 (Miss. 2003), *overruled on other grounds by Lynch v.*

8

*State*, 951 So. 2d 549 (Miss. 2007). In *Goodin*, Goodin filed an application for leave to seek post-conviction relief from his capital-murder conviction and death sentence. *Goodin*, 856 So. 2d at 269. On direct appeal, he had argued that trial counsel was ineffective for one reason. *Id.* at 278. We addressed the claim and held it lacked merit. *Id.* at 278 (citing *Goodin v. State*, 787 So. 2d 639, 652 (Miss. 2001)). In his application, Goodin reasserted ineffective assistance on new grounds. *Goodin*, 856 So. 2d at 281–82. Citing *Lockett v. State*, 614 So. 2d 888 (Miss. 1992), the State argued he was barred from doing so. *Goodin*, 856 So. 2d at 279. Conversely, Goodin cited *Faraga v. State*, 514 So. 2d 295 (Miss. 1987). *Goodin*, 856 So. 2d at 279. In that case, this Court rejected Faraga's ineffective-assistance claims on direct appeal, but later granted him leave to seek post-conviction relief for ineffective assistance on new grounds. *Goodin*, 856 So. 2d at 279 (citing *Faraga*, 557 So. 2d at 775). *Lockett* and *Faraga* thus represented conflicting authority on whether the procedural bar should apply. *Goodin*, 856 So. 2d at 279. We proceeded to address the merits of Goodin's new ineffective-assistance grounds and, ultimately, granted relief on two. *Id.* at 281–85.

¶25.    Based on *Goodin* and our having dismissed Ronk's ineffective-assistance claim without prejudice to his right to raise it in post-conviction proceedings, we find that the claim is not barred.

> A.    *Geiss's health problems and prescription-drug use do not constitute ineffective assistance per se.*

¶26.    To begin, Ronk attributes counsel's ineffectiveness to Geiss's poor health and prescription-drug use. Ronk says Geiss had "numerous chronic maladies." According to Ronk, Geiss retired seven months after the October 4–8, 2010, trial. He died a little more

9

than three years later, on January 22, 2014. The stated cause of death was coronary artery disease; contributing conditions were renal disease, chronic obstructive pulmonary disease, congestive heart failure, and diabetes.

¶27.  To show Geiss's debilitating illnesses and how that affected his performance, Ronk offers three pieces of evidence. First, he filed a supplement and exhibits with more than four thousand pages of Geiss's medical records. To interpret those records, he hired Dr. Sheldon Hersh, a board-certified physician in internal medicine. Second, Ronk cites portions of the trial record. Finally, he offers affidavits from attorneys who worked alongside Geiss.

### 1.  Dr. Hersh opinion

¶28.  Dr. Hersh begins by citing the ABA's *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*. Those guidelines, he says, emphasize that defense counsel in capital cases must provide "high quality legal representation." Based on a reasonable degree of medical certainty, Dr. Hersh says that Geiss (a) "had multiple illnesses, medications, and functional limitations"; (b) "was medically unstable, and . . . neurologically, cognitively, and physically impaired"; and (c) "was unable to provide 'high quality legal representation' required of defense counsel in a complex and demanding capital case."

¶29.  In discussing Geiss's medical instability, Dr. Hersh chronicles Geiss's extensive medical problems:

> chronic obstructive pulmonary disease, chronic bronchitis, obstructive sleep apnea, obesity-hypoventilation syndrome, pulmonary hypertension, cor pulmonale, asthma, pulmonary fibrosis, hypertension, acute and chronic renal failure, uremia, secondary hyperparathyroidism, congestive heart failure,

10

diastolic heart failure, arrhythmia, insulin-dependent diabetes, diabetic nephropathy, diabetic peripheral neuropathy, hyperlipidemia, probable chronic venous insufficiency, anxiety and depression, chronic pain syndrome, gout and gouty arthropathy, and degenerative joint disease. Additionally, he had chronic back, knee, and shoulder pain, along with tremors, edema, nocturia, weakness, and fatigue. He walked with a cane, and he used oxygen for his breathing.

Geiss's obesity compounded those problems.

¶30. Dr. Hersh also discusses Geiss's frequent hospital visits. From January 2009 to May 2011, he was hospitalized seventeen times. About two months before Geiss's being appointed counsel in Ronk's case, he had spent a week in the hospital. And from the time he was appointed counsel up until trial, he visited the emergency room once and was hospitalized six times, with ten-, five-, five-, five-, three-, and four-day stays. The latter ended about a month before trial. Dr. Hersh says those "periods of incapacitation" would have included the days before and days (or weeks) after each hospitalization.

¶31. Dr. Hersh identifies four causes of Geiss's neurological and cognitive impairment: (1) "[c]hronic respiratory failure with hypercapnia, or carbon dioxide retention"; (2) "[o]pioid-use disorder"; (3) "[c]hronic kidney failure with uremia"; and (4) "[p]olypharmacy."

¶32. Regarding the first cause, Dr. Hersh defines "hypercapnia" as "[a]n elevated blood carbon dioxide level . . . [which] causes neurologic and cognitive impairment, manifested by lethargy, drowsiness, coordination difficulty, confusion, and memory loss." Records showed that Geiss had "respiratory, neurologic, and cognitive symptoms" related to respiratory failure and hypercapnia. Those symptoms included drowsiness, shortness of breath, wheezing, inability to speak, lethargy, and lack of endurance. Despite using supplemental oxygen, he had low blood-oxygen levels as well.

11

¶33.    Dr. Hersh says multiple lung diseases—chronic obstructive pulmonary disease (COPD), obstructive sleep apnea (OSA), and obesity-hypoventilation syndrome (OHS)—caused Geiss's hypercapnia. Adding to the problem, Geiss did not comply with treatments. He neither quit smoking nor did he lose weight. And he did not use his nighttime breathing machine regularly.

¶34.    Dr. Hersh identified a second purported cause of Geiss's neurological and cognitive impairment: opioid-use disorder. To be diagnosed with that disorder, the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition* (DSM-5), requires that the person have at least two of eleven diagnostic symptoms within a twelve-month period. Dr. Hersh says Geiss met four. According to Dr. Hersh, records showed Geiss took increasing opioid dosages from 2009 to 2011. Using the Morphine Milligram Equivalents (MME) formula, Dr. Hersh calculated Geiss's daily opioid dosage at 220 MME in 2010. As perspective, Dr. Hersh says the Centers for Disease Control and Prevention suggests that doctors "'use extra precautions' when prescribing an opioid dosage of 50 MME or greater per day" and to "'[a]void or carefully justify' increasing the opioid dosage to 90 MME or greater per day." He also cites a study showing that people "who died of opioid overdose, were prescribed an average of 98 MME/day . . . ."

¶35.    Dr. Hersh says physicians repeatedly suggested that Geiss either decrease or stop using opioids. But he kept using them, even as his respiratory failure and hypercapnia worsened.

¶36.   Dr. Hersh alleged a third cause of Geiss's neurological and cognitive impairment: chronic kidney disease. Dr. Hersh estimates Geiss had stage IV to stage V kidney disease. As kidney failure worsens, he says, uremia—a "toxic buildup of waste products the kidney can no longer excrete"—develops. Uremic symptoms include fatigue and decreased memory and concentration.

¶37.   The final cause Dr. Hersh advances for Geiss's neurological and cognitive impairment is polypharmacy. He describes that as "the use of multiple medications, including over-the-counter and herbal supplements, in a single patient." Records showed Geiss was taking twenty-five medications in December 2010, including three different "opioid-containing medications." Dr. Hersh says two of the medications were improper.

¶38.   In addition to Geiss's neurological and cognitive impairment, Dr. Hersh says Geiss had multiple physical ailments that decreased his strength, stamina, and concentration. Those included shortness of breath; edema, i.e., swelling in his legs; weakness and fatigue; joint pain; diabetic symptoms; peripheral neuropathy, i.e., painful nerve damage in his legs; and tremors and asterixis. Geiss also had chronic pain. Sometimes he was fine; other times, he complained of pain in the seven-to-ten range on the Visual Analog Pain Scale, which measures pain on a scale from zero (meaning no pain) to ten (being the worst pain imaginable). The Warren Grant Magnuson Clinic Center at the National Institutes of Health defines the seven-to-ten range as "severe pain [that is so] disabling [that a person would be] unable to perform [activities of daily living]."

¶39.	The State attacks Dr. Hersh's opinion on several grounds. In part, it challenges his reliance on ABA guidelines and devotes much effort to showing discrepancies between the records he reviewed and his opinion, especially the opioid-use-disorder diagnosis.

¶40.	In an affidavit accompanying Ronk's rebuttal, Dr. Hersh responds to the State's critique. He concludes with a five-point summary:

- Reviewing contemporaneous medical records is a well-accepted and useful method to examine a deceased person's medical problems.

- Mr. Geiss was taking too much opioid medication for his non-cancer pain; there was little documentation to justify this medication in the extensive medical records I reviewed.

- Just because a physician prescribes opioids, it does not mean that the opioids are appropriate or harmless.

- Mr. Geiss had multiple medical problems, which had a negative cumulative effect on his physical, neurologic, and cognitive abilities.

- Multiple medical providers stated that Mr. Geiss'[s] narcotics were worsening his impairments.

    *2.	Trial record*

¶41.	In addition to Dr. Hersh's opinion, Ronk says the debilitating effects of Geiss's illness are evident throughout the record. He gives thirteen examples:

- At Ronk's arraignment, attorney Lisa D. Collums "stood in" for Geiss because he was recovering from some illness/medical problems. The day before, he had been discharged from the hospital following a ten-day stay.

- At a pretrial motion hearing, the court told Geiss he could sit if he needed to. Geiss replied, "No. I get my medicine going and I get dry mouthed."

- At a pretrial motion hearing, Geiss explained how some duplicate motions had been filed due to confusion that arose as he tried to coordinate filings by phone while hospitalized. Ronk cites . . . those duplicate motions and . . . motions signed by non-participating counsel.

14

- In record-reconstruction proceedings during voir dire, the court noted Geiss "ha[d] been excused for a personal reason."

- During voir dire examination, shortness of breath affected Geiss. "You'll have to forgive me," he said, "I get really short of breath."

- After the State rested, the court excused the jury. With the jury out, the court asked Geiss if he had anything. He answered no, but said Ronk needed to be told about his right to testify. The court proceeded to tell Ronk of that right and then granted a recess so Ronk could discuss the decision with counsel. Immediately after the recess, Geiss said, "I'm just really not having a good day. The defense, of course, has some motions before we get to the thing of [Ronk] testifying." At that point, Geiss moved for a directed verdict. From that series of events, Ronk emphasizes Geiss's statement, "I'm really not having a good day."

- During a jury-instruction conference, the court listed several proposed instructions that still had to be considered. The court then asked Geiss if he had any additional instructions. Geiss said, "No. I'm terribly confused." The court later recessed for the evening and said the remaining instructions would be considered the next morning. From that exchange, Ronk highlights Geiss's "terribly confused" comment.

- During closing arguments at the guilt phase, shortness of breath affected Geiss. In mid sentence, he remarked, "[E]xcuse me I'm short of breath," and then continued.

- Stewart, who was second-chair counsel, handled sentencing-phase jury instructions even though he had not otherwise participated in that phase.

- Stewart represented Ronk at the post-trial hearing on Ronk's motion for new trial or judgment notwithstanding the verdict. Stewart affirmed Geiss was unable to attend due to illness.

- In January 2012, as Ronk's direct appeal was pending, the trial court held a hearing on several motions, including motions to correct and supplement the record. The court noted Geiss had been "ill for many years" and had retired sometime after Ronk's trial.

- At that same January 2012 hearing, the court, in recalling certain events during voir dire, noted "Geiss ha[d] been excused for a personal reason."

- At the January 2012 hearing, the court said some breaks were taken during trial to accommodate Geiss. "Geiss was on some medication, I

15

believe, that required him to drink water and go to the rest room [sic]," the court said.

3.    *Affidavits*

¶42.    Finally, Ronk provides affidavits from Matthew Busby and Ramiro Orozco. Busby, who served as an unpaid volunteer attorney for Ronk's defense team, says Geiss was "in extremely poor health" during pretrial and trial proceedings:

> [Geiss's] health declined visibly, and I would not have been surprised if he had passed away anytime during his last two years at the Public Defender's Office. He was in and out of the hospital several times. Toward the end of that time, I believe that Mr. Geiss was doing only routine, low-stress tasks such as preparing preliminary files so that he could get enough time in for disability retirement. He spent a significant amount of time in the office watching movies on DVDs.
>
> . . . .
>
> During the trial, Mr. Geiss's health declined precipitously. He was often red-faced and winded, huffing and puffing. He had fluid on his lungs and a heavy cough. He was a big, heavy-set man. He often sat in a chair with his hands resting on a cane.
>
> . . . .
>
> It was difficult for Mr. Geiss to visit clients at the Harrison County Adult Detention Center due to his health. (Jail visits were somewhat arduous even for those of us in good health.) When he did visit Mr. Ronk, the meetings were not long.
>
> . . . .

Busby believes Geiss's poor health contributed significantly to Geiss's inadequate preparation.

¶43.    Orozco, a former Harrison County Assistant Public Defender, worked with Geiss from 2006 to 2008. He says Geiss "was always ill":

> I believe it was a serious, chronic illness, or illnesses. I do not know the exact nature of his maladies, but I do know he was under the treatment of a

16

physician for heart related matters and was deteriorating at the time of my leaving the Public Defender's office in 2008. I was aware that Mr. Geiss began to be hospitalized frequently after my departure.

Orozco recalls an early experience he had serving alongside Geiss:

A few weeks after I began working at the Public Defender's office, [which would have been late 2006,] I was assigned as second chair on a murder trial. Mr. Geiss was first chair.

I was able to observe Mr. Geiss and his poor health was apparent, to the point that on the first day of trial he showed up to the wrong court room.

Mr. Geiss did not meet with the client until the Friday before the Monday start of the trial and now that I have been practicing for several years I am of the opinion that his performance was substandard.

On the first morning of the trial, at about 9:15, Mr. Geiss still had not appeared in the courtroom, keeping everyone waiting. I went to look for him. I found him sitting in an empty courtroom. No one else was in that room. He did not seem to realize that he was in the wrong room. He looked ill.

Mr. Geiss called no witnesses, he failed to make objections and made inappropriate comments during his closing argument.

I believe that Mr. Geiss'[s] health issues had a detrimental effect in his ability to effectively prepare, present and defend matters for trial. His lack of awareness, stamina[,] and mental clarity were always at issue.

¶44. Altogether, Ronk argues that Dr. Hersh's opinion, the trial record, and Busby's and Orozco's affidavits show Geiss's health problems and prescription-drug use caused counsel to be ineffective. Busby adds "there was no fully functional leader" for the defense team. "No one was calling the shots or directing defense team members what to do," he says. Ronk says that conflicts with ABA guidelines, which say "[l]ead counsel bears overall responsibility for the performance of the defense team, and should allocate, direct, and supervise its work in accordance with these Guidelines and professional standards." Am. Bar Ass'n, *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, Guideline 10.4 B,

17

31 Hofstra L. Rev. 913, 999 (2003), https://bit.ly/2OpruRD. He concludes, "it is difficult—if not impossible—to imagine someone in Mr. Geiss's condition being able to be effective [as lead counsel]."

¶45. Ronk likens his case to *Edge v. State*, 393 So. 2d 1337 (Miss. 1981), and *Thornton v. State*, 369 So. 2d 505 (Miss. 1979)—two noncapital cases in which he says this Court reversed convictions when counsel was ineffective due to illness.

¶46. In *Edge*, this Court held that Edge, who had been convicted of murder, was denied effective assistance of counsel because the trial court had refused to grant counsel's request for a recess. *Edge*, 393 So. 2d at 1338, 1341–42. When the request was made, trial proceedings had been ongoing for ten hours, and the State had just rested. *Id.* at 1341–42. Counsel, who was on some medication, said he was "extremely fatigued" and did not think he could "do the job adequately." *Id.* at 1341. This Court held that denying a recess deprived Edge his right to effective assistance because the trial court, over counsel's objection, had pushed counsel beyond his physical limits at a crucial stage of trial. *Id.* at 1342.

¶47. Ronk says Geiss's performance was like counsel's performance in *Edge*: Both could not adequately perform, had decreased mental alertness, and were medicated and fatigued. It is true that Geiss never sought a recess or a continuance. But instead, he simply let other counsel fill in. By doing so, he failed to fulfill his duties as lead counsel. Ronk contends Geiss's assistance was even less effective than what was deemed reversible in *Edge*.

¶48. In *Thornton*, this Court held that Thornton, who had been charged with murder but convicted of manslaughter, was denied effective assistance when counsel had to be

18

hospitalized after the trial court denied a motion for recess and continued trial late into the night. *Thornton*, 369 So. 2d at 505–07. In that case, counsel moved for a recess after the State rested at about 6:00 p.m. *Id.* at 506. Counsel said hours of additional witnesses, jury instructions, and closing arguments remained. *Id.* Furthermore, two of the defense attorneys were around seventy years old and were "very tired and exhausted." *Id.* The trial court denied the motion, and trial proceeded past 10:00 p.m. *Id.* at 506. Then, during closing arguments, one of the elderly attorneys began acting strange, became disoriented, and had to be rushed to the hospital. *Id.* This Court held that, under those circumstances, extending trial had been unreasonable and had deprived Thornton of effective assistance. *Id.* at 507.

¶49.    Ronk admits *Thornton* differs in some respects, but he insists that Geiss's "neurological, cognitive, and physical impairments were more severe and more chronic" than counsel's impairments in that case.

¶50.    In addition to *Edge* and *Thornton*, Ronk likens his case to *Nance v. Ozmint*, 626 S.E.2d 878 (S. C. 2006). In *Nance*, a capital case, the Supreme Court of South Carolina held that post-conviction relief was warranted because trial counsel had "failed to act as an adversary to the prosecution, but instead helped to reinforce the case against his client." *Nance*, 626 S.E.2d at 878, 883. In that case, lead counsel had numerous illnesses (pneumonia, gout, ulcers, diabetes, alcoholism, and congestive heart failure) and was on several medications (Valium, Lopressor, Isocet, and Tenormin), which caused memory impairment, sleep deprivation, and sedation. *Id.* at 881. Lead counsel and co-counsel, who had been practicing law for eighteen months, interviewed only the petitioner's mother,

19

neglected to investigate his background, failed to seek prison records, and gave hospital records to their expert psychologist only a few hours before trial. *Id.* At the guilt phase, counsel's presentation "consisted of testimony of a corrections officer concerning the only incident of misconduct that [the] [p]etitioner committed while incarcerated; an opinion by an uninformed psychiatrist who was not qualified as an expert; and unprepared testimony of [the] [p]etitioner's sister about [the] [p]etitioner's oddities as a child." *Id.* at 881–82. At sentencing, counsel's brief mitigation presentation consisted of waiving an opening statement, incorporating defense testimony from the guilt phase, offering a corrections officer who testified about the petitioner's prescription medications, and giving a closing argument in which counsel refused to plead for the petitioner's life and referred to him as a "sick" man who had done "sick things." *Id.* at 882. The court deemed counsel's performance a "classic" ineffectiveness case under *United States v. Cronic*, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984). *Id.* The *Cronic* Court had identified three situations in which prejudice is presumed: (1) "when the defendant is completely denied counsel 'at a critical stage of his trial'"; (2) "if there has been a constructive denial of counsel," i.e., counsel "'entirely fails to subject the prosecution's case to meaningful adversarial testing,' thus making 'the adversary process itself presumptively unreliable'"; and (3) "when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Id.* at 880 (quoting *Cronic*, 466 U.S. at 659). The court reasoned that *Nance* fit *Cronic*'s very rare

20

second scenario for eight reasons, with lead counsel's "ill health and heavy medication" among them. *Id.* at 882–83 (citation omitted).

¶51. The State, on the other hand, says illness alone is insufficient. It insists that Geiss's health is not the issue: the issue is what, if any, effect his health had on Ronk's trial. As support, it cites *Berry v. King*, 765 F.2d 451 (5th Cir. 1985), and *Hodges v. State*, 949 So. 2d 706 (Miss. 2006). In *Berry*, the United States Court of Appeals for the Fifth Circuit said that, under *Strickland*, "the fact that an attorney used drugs is not, *in and of itself*, relevant to an ineffective assistance claim." *Berry*, 765 F.2d at 454 (emphasis in original). "The critical inquiry," rather, "is whether, for whatever reason, counsel's performance was deficient and whether that deficiency prejudiced the defendant." *Id. Hodges* involved a death-penalty post-conviction proceeding. *Hodges*, 949 So. 2d at 709–10. Hodges argued, in part, that counsel was ineffective due to inexperience, mental illness, and drug use. *Id.* at 721. We held that while illness and drug use may have explained some of counsel's behavior, those factors did not prove he was ineffective. *See id.* at 721. Notably, the United States District Court for the Northern District of Mississippi later granted Hodges *habeas corpus* relief, in part, on his ineffective-assistance claim based on counsel's inexperience and mental illness and the cumulative effect of other numerous errors. *Hodges v. Epps*, No. 1:07CV66-MPM, 2010 WL 3655851, at **38–39 (N.D. Miss. Sept. 13, 2010), *aff'd in part*, 648 F.3d 283 (5th Cir. 2011).

¶52. The State adds that when a defendant is represented by multiple attorneys, as here, an ineffective-assistance claim is hard to mount. *United States v. Dunfee*, 821 F.3d 120, 128

21

(1st Cir. 2016) (citing *Lopez-Nieves v. United States*, 917 F.2d 645, 647 (1st Cir. 1990));

*Havard v. State*, 988 So. 2d 322, 345–46 (Miss. 2008) (rejecting Havard's claim that one of his attorneys was incompetent due, in part, to insufficient evidence and the presence of co-counsel).

¶53.    While Geiss's illnesses and prescription-drug use are troubling, the weight of authority says illness and drug use alone do not render counsel ineffective. The critical inquiry is (1) whether counsel's performance was deficient and, if so, (2) whether the deficiency prejudiced Ronk. *Berry*, 765 F.2d at 454; *see also Smith v. Ylst*, 826 F.2d 872, 876 (9th Cir. 1987) (holding mental illness is not ineffective assistance per se); *Burnett v. Collins*, 982 F.2d 922, 930 (5th Cir. 1993) (holding attorney's alcohol abuse alone did not render him ineffective); *Buckelew v. United States*, 575 F.2d 515, 520–21 (5th Cir. 1978) (rejecting the appellants' ineffective-assistance claim based on counsel's age and poor health because no prejudice was shown); *United States v. Eyman*, 313 F.3d 741, 743 (2d Cir. 2002) (citations omitted) ("In order to assert a claim based on ineffective assistance due to illness, a defendant must point to *specific* errors or omissions in his courtroom behavior and conduct at trial that were a product of the attorney's illness."). Ronk does not argue that this is a *Cronic* case so that prejudice should be presumed. And even if he did, *Cronic*'s presumed-prejudice standard would not apply here. *See Florida v. Nixon*, 543 U.S. 175, 190, 125 S. Ct. 551, 562, 160 L. Ed. 2d 565 (2004) (describing *Cronic* as a "narrow exception" to *Strickland*); *United States v. Gurolla*, 333 F.3d 944, 958 (9th Cir. 2003) (stating that

22

*Strickland*, not *Cronic*, would apply to a claim that counsel was ineffective due to serious illness throughout trial).

¶54.    Neither *Edge*, *Thornton*, nor *Nance* apply here. In *Edge* and *Thornton*, specific incidences at trial occurred in which the court unreasonably refused to accommodate attorneys and pushed them beyond their physical limits. No such incident is apparent here. And in *Nance*, lead counsel's illness and heavy medication were among many factors that caused counsel to be ineffective. The "most compelling" factor in that case was not lead counsel's illness and heavy medication, but counsel's abandoning the defense role and actually helping bolster the case against the client. *Nance*, 626 S.E.2d at 883.

¶55.    As for Busby's assertion that "no fully functional leader" was present, some evidence to the contrary was presented. The record shows that, even when he was hospitalized, Geiss tried to coordinate filing motions. And it supports that a coordinated team effort took place at trial. Geiss, for the most part, handled motions; voir dire; opening statements and closing arguments at both the guilt and sentencing phases; cross-examination of two witnesses during the guilt phase; jury instructions at the guilt phase; and direct examination of the lone witness at the sentencing phase. Stewart cross-examined four witnesses at the guilt phase and handled jury instructions at the penalty phase. Stough and Busby each cross-examined three witnesses at the guilt phase.

¶56.    At any rate, even if a fully functional leader was lacking, Ronk still must show prejudice.

    B.    *Counsel was not ineffective at sentencing.*

23

¶57. Ronk argues counsel was ineffective at sentencing in four ways. First, he says counsel failed to conduct a constitutionally adequate mitigation investigation. Second, he claims counsel "opened the door" to damaging, prejudicial evidence in examining psychologist Dr. Beverly Smallwood. Third, he asserts counsel failed to discover, put on, and properly explain Ronk's mental disorders. Finally, he argues counsel's opening statement and closing argument constituted ineffective assistance.

    *1.    Counsel's mitigation investigation arguably was deficient; however, Ronk fails to make a substantial showing of prejudice.*

¶58. In capital cases, counsel must investigate a defendant's background. ***Wiggins***, 539 U.S. at 522 (stating counsel in ***Williams v. Taylor***, 529 U.S. 362, 396, 120 S. Ct. 1495, 1515, 146 L. Ed. 2d 389 (2000), did not "fulfill[] their obligation to conduct a thorough investigation of the defendant's background"); *see also* ***Harries v. Bell***, 417 F.3d 631, 637 (6th Cir. 2005) (citations omitted) ("Counsel's constitutional duty to investigate a defendant's background in preparation for the sentencing phase of a capital trial is 'well-established.'"). A thorough investigation renders strategic choices "virtually unchallengeable." ***Wiggins***, 539 U.S. at 521 (quoting ***Strickland***, 466 U.S. at 690–91). At the same time, counsel are "not require[d] . . . to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." ***Wiggins***, 539 U.S. at 533. Reasonableness, rather, is the standard:

> [S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular

decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.* at 521–22 (quoting *Strickland*, 466 U.S. at 690–91). The assessment, then, includes not only what counsel discovered, but also whether that evidence would have led a reasonable attorney to investigate further. *Wiggins*, 539 U.S. at 527.

¶59. If counsel's investigation is deemed deficient, prejudice is assessed by "reweigh[ing] the evidence in aggravation against the totality of available mitigating evidence." *Id.* at 534. No prejudice exists if "the new mitigating evidence 'would barely have altered the sentencing profile presented' to the decisionmaker . . . ." *Chamberlin v. State*, 55 So. 3d 1046, 1054 (Miss. 2010) (quoting *Sears v. Upton*, 561 U.S. 945, 954, 130 S. Ct. 3259, 3266, 177 L. Ed. 2d 1025 (2010)); *see also* *Buckner v. Polk*, 453 F.3d 195, 207 (4th Cir. 2006) (holding that the new evidence, at best, merely "round[ed] out the details of a personal history already presented to the jury").

¶60. Ronk cites *Williams*, *Wiggins*, and *Rompilla v. Beard*, 545 U.S. 374, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005), as the seminal cases concerning constitutionally adequate mitigation investigations.

¶61. In *Williams*, the Supreme Court held that counsel was ineffective for failing to investigate and present substantial mitigating evidence. *Williams*, 529 U.S. at 395–99. In that case, at sentencing, the prosecution produced evidence of Williams's prior violent crimes and called experts who said a "high probability" existed that he posed a serious, continuing threat to society. *Id.* at 368–69. Defense counsel, in turn, produced three witnesses and a taped

25

excerpt from a psychiatrist's statement. *Id.* at 369. The three witnesses described Williams

as a "nice boy" and nonviolent; the psychiatrist's statement simply showed that during a prior

robbery, Williams had removed bullets from a gun so no one would be injured. *Id.* Defense

counsel also emphasized that Williams had turned himself in (which enabled police to solve

several crimes), cooperated, and expressed remorse. *Id.* at 369, 398. The Supreme Court said

defense counsel's performance fell short of professional standards by not "fulfill[ing] their

obligation to conduct a thorough investigation of [Williams's] background. *Id.* at 396 (citing

1 ABA Standards for Criminal Justice 4–4.1 cmt. (2d ed. 1980)). Had counsel done so, they

would have "uncovered extensive records graphically describing Williams'[s] nightmarish

childhood." *Id.* at 395. From those records, the jury

> would have learned that Williams'[s] parents had been imprisoned for the
> criminal neglect of Williams and his siblings, that Williams had been severely
> and repeatedly beaten by his father, that he had been committed to the custody
> of the social services bureau for two years during his parents' incarceration
> (including one stint in an abusive foster home), and then, after his parents were
> released from prison, had been returned to his parents' custody.

*Id.* (internal footnote omitted). In addition, defense counsel failed to (a) "introduce available

evidence that Williams was 'borderline mentally retarded' and did not advance beyond sixth

grade in school"; (b) seek prison records that showed he had received commendations in

prison; (c) seek favorable testimony from prison officials; and (d) return a phone call from

someone who had offered to testify about Williams's participating in a prison-ministry

program and earning a carpentry degree while in prison. *Id.* at 396. While not all the

additional evidence was favorable, the Supreme Court said that "the entire postconviction

record, viewed as a whole and cumulative of mitigation evidence presented originally, raised

'a reasonable probability that the result of the sentencing proceeding would have been different' if competent counsel had presented and explained the significance of all the available evidence." *Id.* at 396, 398–99.

¶62.   In *Wiggins*, likewise, the Supreme Court held that counsel was ineffective for failing to investigate Wiggins's background and to present mitigating evidence of his unfortunate life history. *Wiggins*, 539 U.S. at 514, 538. In that case, counsel did some investigation. *Id.* at 523. First, counsel hired a psychologist who found that Wiggins "had an IQ of 79, had difficulty coping with demanding situations, and exhibited features of a personality disorder." *Id.* (citation omitted). The psychologist's reports said nothing, however, about his life history. *Id.* Second, counsel had a one-page "'personal history' noting [Wiggins's] 'misery as a youth,' quoting his description of his own background as 'disgusting,' and observing that he spent most of his life in foster care." *Id.* Finally, counsel had social-service records documenting his various foster-care placements. *Id.* The latter showed (a) his mother was a chronic alcoholic; (b) he displayed emotional difficulties in foster care; (c) he frequently missed school for long periods of time; and (d) "on at least one occasion, his mother left him and his siblings alone for days without food." *Id.* at 525. Instead of investigating further, counsel chose to emphasize that Wiggins was not directly responsible for the murder and presented no evidence of his life history. *Id.* at 515–18. The Supreme Court said counsel's investigation was unreasonable. *Id.* at 528–29. Counsel's limited investigation, the Court said, fell short of both local and ABA standards because they neither prepared a social-history report nor did they try to discover all reasonably available mitigating evidence. *Id.*

27

at 524. "[C]ounsel abandoned their investigation of [Wiggins's] background after having acquired only rudimentary knowledge of his history from a narrow set of sources," the Court continued. *Id.* (citations omitted). Counsel had "uncovered no evidence in their investigation to suggest that a mitigation case, in its own right, would have been counterproductive, or that further investigation would have been fruitless." *Id.* at 525 (citations omitted). To the contrary, further investigation would have revealed Wiggins's "bleak life history," which included physical and sexual abuse. *Id.* at 516–17. What is more, sentencing proceedings suggested that counsel's "failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment." *Id.* at 526. Counsel put on a "halfhearted mitigation case," telling the trial court that they were prepared to present mitigating evidence and even asking the jury to consider "who [Wiggins] is" and his hard life, but never following up with specifics about his history. *Id.* In sum, the Supreme Court concluded that if the jury had heard all the mitigating evidence, it may have assessed Wiggins's moral culpability differently. *Id.* at 538. (citation omitted).

¶63.    Finally, in *Rompilla* the Supreme Court held that even if a capital defendant and his or her family members suggest no mitigating evidence exists, counsel still must "make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial." *Rompilla*, 545 U.S. at 377. In that case, counsel interviewed Rompilla, who was uninterested and even "actively obstructive" at times, and family members. *Id.* at 381. They also had three mental-health experts evaluate him. *Id.* at 382. But counsel did not examine Rompilla's school

28

records or records of his prior convictions. *Id.* Nor did they follow up on evidence of possible alcohol dependance. *Id.* The Supreme Court said, at the very least, counsel were deficient for not examining Rompilla's prior-conviction records when they knew the prosecution intended to use his prior felony convictions as an aggravator. *Id.* at 383, 389. Had counsel examined those records, they would have found "a range of mitigation leads." *Id.* at 390. The records showed that Rompilla (a) was raised in a "slum environment"; (b) quit school at age sixteen; (c) was in and out of jail; (d) abused alcohol; (e) showed signs of schizophrenia and other disorders; (f) and had a third-grade cognition level. *Id.* at 390–91. And with further investigation, counsel presumably would have uncovered that (a) his parents were severe alcoholics; (b) his mom drank during pregnancy; (c) his dad severely beat his mom and bragged about cheating on her; (d) his parents fought violently; (e) his dad abused him verbally and physically; (f) he was forced to sleep in an unheated attic; and (g) he was not given clothes. *Id.* at 391–92. In addition, mental-health experts retained by post-conviction counsel found that he suffered from organic brain damage, could not appreciate the criminality of his conduct, and had an IQ in the mentally retarded range. *Id.* at 392–93. All that mitigation evidence surpassed the "few naked pleas for mercy" that constituted counsel's mitigation case. *Id.* at 393. And had the jury heard such evidence, the likelihood of a different result was "'sufficient to undermine confidence in the outcome' actually reached at sentencing." *Id.* (citing *Strickland*, 466 U.S. at 694).

¶64. We have said that "at a minimum, counsel has a duty to interview potential witnesses and to make independent investigation of the facts and circumstances of the case." *Ross*,

954 So. 2d at 1005 (quoting *Ferguson v. State*, 507 So. 2d 94, 96 (Miss. 1987)); *Doss*, 19 So. 3d at 698 (quoting *Doss v. State*, 882 So. 2d 176, 189 (Miss. 2004) ("Counsel's minimum duty is to interview potential witnesses and to make an independent investigation of the facts and circumstances of the case.").

¶65.    In *Ross*, we held that counsel was ineffective at sentencing for two reasons. *Ross*, 954 So. 2d at 1006. First, counsel failed to investigate potential psychological problems simply because Ross had said he was not "crazy." *Id.* Yet his life history included physical and sexual abuse; possible alcoholism; hallucinations; his sister's murder; and the tragic deaths of his ex-wife and four children in a car accident. *Id.* While the jury heard much of that information, counsel provided no expert to explain how those experiences had affected him psychologically. *Id.* Second—and "[f]ar more problematic"—was counsel's failure to adequately investigate Ross's record as an inmate. *Id.* For mitigation, counsel had emphasized Ross's good character, especially his reputation as a "good prisoner." *Id.* at 1005. That evidence, however, opened the door for the State to introduce Ross's bad acts while incarcerated: he had been moved to a higher security facility for possessing a hacksaw and trying to escape, and he had been punished for making alcoholic beverages in his cell. *Id.* at 1005–06. Those bad acts cast him "as unrepentant, a habitual criminal, and a danger to society." *Id.* at 1006. Given the severity of the charge, we said counsel's deficiencies undermined our faith in the sentence. *Id.*

¶66.    Similarly in *Doss*, we held counsel was ineffective at sentencing. *Doss*, 19 So. 3d at 698, 708. There, we said that if counsel had reviewed records and followed up with potential

30

witnesses, he would have uncovered mitigating evidence almost identical to that in *Rompilla*. *Id.* at 708. Records showed that Doss (a) drank alcohol regularly and had started drinking at age eleven; (b) had tried other drugs; (c) attended special-education classes and did poorly in school; (d) had a low IQ; (e) had family and legal issues; and (f) showed signs of psychological disorders. *Id.* at 707. In addition, counsel did not elicit testimony from Doss's mother about his abusive, poverty-stricken home environment. *Id.* at 704, 707. "[T]aken as a whole," the Court said, "[the mitigation evidence discovered by post-conviction counsel] might well have influenced the jury's appraisal of Doss'[s] culpability, and the likelihood of a different result if the evidence had gone in [was] sufficient to undermine confidence in the outcome." *Id.* at 708 (quoting *Rompilla*, 545 U.S. at 393).

¶67. Here, Ronk's mitigation case consisted of the following.

¶68. Pretrial, he moved for Dr. Smallwood to conduct a psychiatric/psychological evaluation "to determine whether he knew right from wrong at the time of the alleged incident, whether he [was] competent to assist counsel in the trial of his case and[] whether or not a psychological evaluation would reveal any mitigating circumstances." The trial court granted the motion, authorizing counsel to hire Dr. Smallwood. The order permitted Dr. Smallwood, in part, "to prepare a mitigation study." At a motions hearing weeks later, however, Geiss explained he was only requesting a psychological evaluation at that time. "I don't know if there is anything that [Dr. Smallwood] can provide to us that would have any particular use by way of mitigation," he said. "If that arises during her psychological evaluation we will instruct her to proceed."

31

¶69. At sentencing, the State reintroduced all testimony and evidence from the guilt phase and offered a sentencing order showing Ronk's prior guilty-plea conviction for grand larceny. Ronk called one witness: Dr. Smallwood. Her twenty-five page psychological evaluation was entered into evidence, and she testified as follows.

¶70. Dr. Smallwood evaluated Ronk to determine (1) whether he knew right from wrong when the crime occurred; (2) whether he was competent to stand trial; and (3) his level of intelligence. She found that (1) he had mental disorders but knew right from wrong; (2) he was competent to stand trial; and (3) his IQ was 114, in the "high average category." Early on, she explained she had not done a full mitigation study. "That's outside of the scope of my practice," she said. Still, she said some information she had uncovered was relevant for sentencing.

¶71. Ronk was adopted at three days old. His adoption caused resentment; he felt he was a mistake, and he tended to direct anger toward his adoptive parents. He threatened them and would hit or "mess up" walls.

¶72. Between ages ten and thirteen, he began abusing alcohol, marijuana, and eventually methamphetamine. Alcohol and drug abuse, Dr. Smallwood said, likely enhanced his behavioral problems over the years.

¶73. According to Ronk's parents, with whom Dr. Smallwood spoke, Ronk began having "significant problems" at age ten. Throughout his life, he had numerous hospital stays for mental problems. In one stay, he was diagnosed with bipolar disorder, formerly called manic depression, and attention deficit with hyperactivity disorder (ADHD). Dr. Smallwood said

his symptoms, which included several suicide attempts, were consistent with those disorders. All his life, he had exhibited "impulsive behavior, aggressive and threatening kind of behavior, not thinking before he made decisions"—"[h]allmarks of both [bipolar] disorder and ADHD." She defined bipolar disorder as "a serious mental disorder that is based on an imbalance in brain chemistry in which the person has severe depression at times and then may be manic at times." It is uncommon, she said, and requires "a very specific set of criteria." "[O]nly .4 percent to 1.6 percent of the population is, in fact, bipolar," she explained.

¶74.    In addition to bipolar disorder and ADHD, Dr. Smallwood said Ronk appeared to have a "conduct disorder" in his childhood. She explained that it was not just "a little bad behavior" but "a repetitive and persistent pattern of behavior in which the basic rights of others or age appropriate norms are violated." "It can involve aggression to people or animals, it could involve destruction of property, deceitfulness and threat of serious violation of rules . . . ," she said.

¶75.    She conveyed that Ronk's "[v]ery severe problems from many, many, many years back" are still evident. His bipolar disorder and ADHD left him prone to make wrong decisions and, compared to the average person, made it much more difficult for him to control his impulsive behavior. That said, Ronk's conditions did not render him unable to control his behavior. "[M]y evaluation did find that [Ronk] did not have a mental disorder that overpowered his will to the point that he did not know right from wrong," she said.

¶76. On cross-examination, Dr. Smallwood added antisocial personality disorder as a diagnosis. Symptoms Ronk exhibited were "failure to conform to social norms about lawful behavior"; "deceitfulness and lying behavior"; "impulsivity"; "failure to plan ahead"; "irritability and aggressiveness"; "reckless disregard for the safety of himself or others"; "consistent irresponsibility"; and "often rationaliz[ing]his behavior." When asked if antisocial personality disorder is a synonym for "sociopathic," she explained that "sociopathic" is "[s]ometimes . . . kind of a lay term that's used when we say antisocial personalities."

¶77. As part of her evaluation, she tested whether Ronk was malingering, i.e., exaggerating or faking psychological symptoms. Of the eight malingering subtests she administered, he scored in the "honest range" for two, "probably feigning" in two, and indeterminate in the other four. In short, he was not completely honest with her. She knew that, though, and acknowledged the fact on cross-examination. But neither his exaggeration nor his lying altered her opinion. "The diagnosis was made early in his life, and it doesn't change my observations of whether he met the criteria," she said.

¶78. Her report provided more details.

¶79. The initial background information said that Ronk was born in Flowood, Mississippi. A New Jersey couple, Susan and Robert Ronk, adopted him. His relationship with them "has been strained most of his life, as he has 'been a drug and alcohol addict since ten.'" Years before, he had learned from his biological mother that he "was born as the result of a rape."

34

¶80. Ronk is married but had separated from his wife. He attributed their separation to her addiction. They have no children together.

¶81. Educationally, Ronk dropped out of school in twelfth grade. He claimed he scored a "genius IQ" in fifth grade, but school bored him. He hardly went and did not do his homework. At age eighteen, his parents kicked him out of the house "because of his addiction."

¶82. Occupationally, Ronk worked various jobs throughout his life. He bartended, assisted a veterinarian, led praise and worship at a church, managed clothing stores, waited tables, worked construction, landscaped, sold cars, changed tires and aligned brakes, climbed poles for a cable company, and owned a marketing firm. He claimed to have built the marketing firm and sold it for $150,000 in just seven months. Otherwise, he never kept a job more than six months because he would get restless and bored.

¶83. Ronk's legal history included prior convictions for first-degree theft of property and grand larceny. At the time of Craite's murder, he had been on house arrest for grand larceny.

¶84. Medically, Ronk reported an "extensive history of mental health problems and mental health treatment." Over the years, he was treated in sixteen different hospitals across the country for "being severely depressed, h[ear]ing voices telling him to hurt himself or others, and chemical addictions." During one stay, he reported having seizures and blacking out whenever he lost his temper. Five times he went to rehabilitation programs, including a two-year stint at one point. He would do okay for a while, but then he would relapse.

¶85.   Ronk either exhibited or spoke about several mental-health issues. He showed symptoms of depression, e.g., low mood, weight gain, hypersomnia, psychomotor agitation, fatigue, feelings of worthlessness, irritability, and concentration problems. He also had a history of suicide attempts. And although he did not report having been diagnosed as bipolar, he had symptoms that "could be indicative of episodes of mania" or of amphetamine use:

> [Ronk] reported that he has sometimes not slept for four or five days at a time. During those periods, he feels that "no one can touch me. I can do anything." He does not believe he will get in trouble. He is talkative and has pressured speech. He reports flight of ideas and racing thoughts "99% of the time, even when I'm depressed." He endorses distractibility and psychomotor agitation. He reported that he was a "cutter" for a while, revealing the scars on his arms and chest.

Ronk also struggled with anxiety, panic attacks, and auditory hallucinations. He claimed he had heard voices saying, "They are out to get you. Kill them before they kill you. Those people don't like you. Kill yourself. No one cares. All will be happier. You can rob that house and get away with it. No one will know." Even so, Dr. Smallwood saw no sign of psychosis during her examination.

¶86.   In addition, Ronk had "a long substance abuse history." At age ten, he stole beer, got drunk, and tried marijuana. "When I smoked weed, I felt normal. I didn't hear voices any more," he said, "I started smoking every day. I stole from my parents to support the habit." Through the years, his drug use progressed. At age fourteen, he started taking acid; at sixteen, cocaine; at eighteen, heroin; and at twenty, methamphetamine. Methamphetamine became his drug of choice until 2005. Since then, he has only drunk alcohol. He claimed he drank "a minimum of a quart of Jaegermeister a day, a maximum of a gallon."

36

¶87. When asked about past traumas, Ronk identified four. First, his adopted parents said they wished he had never been born. Later in the report, he gave some context:

> My parents put me in counseling in fourth grade because my grades were slipping. They told me that the biggest mistake they made was adopting me, and they wish I wasn't born. I started rebelling. I was adopted at three days old. I was a straight A student, and I guess I caught them on a bad day because m[y] breaking a dish pushed them over the edge, and they said that.

Second, he learned from his biological mother that he was conceived as a result of rape. Since learning that, he has felt like a mistake. That knowledge led him to attempt suicide. Third, in fourth grade he was put in accelerated classes, which caused his friends to think he was a nerd and to stop talking to him. Finally, he cited his marriage's demise. After he and his wife separated, he tried to hang himself.

¶88. When Dr. Smallwood asked Ronk a series of questions about his psychological history, he responded as follows.

¶89. In third grade, he started smoking. So his parents put him in counseling. There, he was diagnosed with ADHD. He refused to take his medication, however, because "they wanted me to [take it]."

¶90. In fourth grade, his parents put him in counseling again because his grades were slipping. Altogether, he spent eight years in counseling. He alleged that on one occasion, a counselor picked him up by the throat.

¶91. At any rate, Ronk said he "wasn't doing good in school, [was] very rebellious, and still smoking." At age sixteen, following a fight with his mom, his parents sent him to a

37

psychiatric facility for two-and-a-half weeks. There, he was diagnosed with anger problems, mild seizures, and ADHD. He received medication, but nothing changed.

¶92.    At some point, Ronk went to a military school. There, "[he] did whatever [he] wanted"—smoked weed, made acid, snuck out, fought, and got drunk.

¶93.    In his first senior year, he and some friends made bomb threats, called fire drills, and started fires to avoid exams. During his second senior year, he got a job at a retail store and decided to quit school.

¶94.    After quitting school, he attempted suicide by overdosing on pills. That led to a three-week stay in intensive care, followed by several weeks at a country-club-like facility in New York.

¶95.    When he got out, he returned home. Eventually, though, his parents kicked him out, and he started living on the streets. Around that time he got arrested for the first time for making "terroristic threats" against his mother. They had gotten in a fight, and she alleged he had threatened to kill her. The charges were later dismissed.

¶96.    At age eighteen, Ronk began working in construction, followed by stints as a car salesman, auto mechanic, and cable utility pole worker. During that time, he was drinking and smoking marijuana. He was also introduced to "X (Ecstasy), meth, Special K, GHB."

¶97.    He ended up living under a bridge. At that point, he called his parents for help. They got him in a faith-based rehabilitation program. He loved it. "I found God. I was introduced to music for the first time, and I enjoyed being there. I wish I could go back," he said. After seven months, however, he was kicked out for having a relationship with a girl in the

program. The discharge put him in violation of his probation for a shoplifting conviction, so he spent forty-five days in jail.

¶98.   Upon being released from jail, Ronk again called his parents. They found him a job at Old Navy, but he quit after about nine months because "they wouldn't give [him] a raise or benefits." From there, he worked at another retail clothing store and then bartended for about a year and a half. "The profits," he said, "were either going down my throat or up my nose. I was actually buying cocaine from my manager."

¶99.   Ronk claimed he witnessed the September 11, 2001, terrorist attacks in New York City and helped remove dozens of bodies from the debris. "I still have nightmares about the smell of burning flesh. I worked doing that for about [a] month," he said.

¶100.  As his drinking increased, he realized he needed help and checked himself back into the same faith-based program that had kicked him out. Six months later, he got mad and left.

¶101.  He returned to heavy drinking and methamphetamine use. He tried rehabilitation again in December 2002 and managed to get off methamphetamine. Eventually, he went back home and tried to make amends with his parents. He lived in a homeless shelter, but saw them every week and ate dinner and attended church with them.

¶102.  During that period, Ronk reconnected with his biological mother, whom he had not seen since he was a teenager. That experience proved disappointing. "She showed me the hospital where I was born and asked me to leave because I was the result of a rape, and it was too many bad memories," he said. After leaving his biological mom, he "felt like a mistake" and tried to kill himself.

¶103. After that, Ronk continued working, drinking, and trying to live life even though he did not want to. Through it all, he experienced "a lot" of failed relationships.

¶104. Ronk said he entered his last rehabilitation program in 2005. There, he met and married his wife. After only three months, she started smoking crack and cheating on him, and their relationship ended. That led him to try to hang himself. He sought help and was diagnosed with "[s]ituational [d]epression." Eventually, he managed to get a job and checked himself into a halfway house in Mobile, Alabama.

¶105. While in Mobile, he sought to reconcile with his parents. He moved back in with them and got a job. He was doing well when a job opportunity arose in Mobile. He moved back to Mobile for the job, but did not get it. So he started waiting tables and tried, unsuccessfully, to save his marriage.

¶106. Eventually, he returned to New Jersey at his parents' urging. There, he waited tables and drank heavily.

¶107. Dr. Smallwood concluded her report as follows:

> It is my opinion, to a reasonable degree of psychological certainty, that:
>
> a)    . . . Ronk knew right from wrong at the time of the alleged crimes;
>
> b)    [Ronk] is competent to assist counsel in his defense;
>
> c)    the level of intelligence of [Ronk] is in the High Average range, with a Full Scale IQ of 114.
>
> In addition to the above findings, it must be noted that many variables which may provide mitigation are reportedly found in this man's psychological and medical history. However, I do not have the benefit of those medical records. It is highly recommended that these and other relevant records be secured and that collateral witnesses be interviewed. The present examination is not a mitigation study, which is outside the scope of my current practice.

. . .

With respect to the above questions posed by the [c]ourt and addressed in the previous section, no further evaluation is needed. However, as noted, a mitigation study is recommended.

¶108. Ronk argues no mitigation investigation was done. Dr. Smallwood made clear that she did not do a mitigation study, which is outside the scope of her practice. She recommended that one be done, however, and that did not occur. As support, Ronk attaches affidavits from his adoptive mom, Susan; his biological mom, Jackie Burrell; and Busby. Susan says she was unaware of any mitigation investigation. Her affidavit, alongside Burrell's, support that counsel did not

- interview Ronk's adoptive parents about his background or seek contact information for his friends, teachers, church members, or other family members;

- attempt to contact mental-health professionals Ronk had seen beginning when he was in fifth grade;

- try to reach Burrell, who has lived at the same address since 1999; or

- seek to learn about Ronk's biological dad.

Busby says counsel did not develop available mitigation evidence. He says he acquired Ronk's "voluminous" medical records at his own expense; those records are attached as an exhibit to his affidavit. Busby says he showed them to Geiss, but Geiss simply shoved them aside and never used them. Ronk claims those records "show a long history of trauma and serious mental-health problems that, if they had only been put before the jury, would have had a reasonable probability of resulting in a different outcome."

¶109. The records attached to Busby's affidavit concern a four-day hospital stay from late December 2007 to early January 2008. Ronk was hospitalized after having been kicked out

of a facility for stealing cigarettes. At the time, he was facing grand-larceny charges for stealing music equipment from his biological sister; his adoptive parents had bailed him out. A "Discharge Summary" notes, in part, his "chronic mental health history"; a July 2007 commitment to Whitfield; "multiple polypharmacy psychotropic medication regimens" with compliance issues; "suicidal ideations"; "multiple suicide attempts"; depression; homelessness; and "history of impulsivity when manic, including gambling, sexual promiscuity, stealing, and drug abuse, primarily crystal meth, although he has been in remission . . . since December 31, 2002." On discharge, he was diagnosed with Axis I bipolar disorder and polysubstance dependance and Axis II "borderline, antisocial, and narcissistic personality traits." Another document shows that the hospital spoke with Ronk's adoptive parents, who said that he had a "long history of erratic impulsive behavior" beginning in fifth grade. They also said he had been diagnosed with "frontal lobe problems" when he was younger and that his biological sister "is reportedly bipolar."

¶110. In addition to the records from Busby, Ronk attaches nearly one thousand pages of additional medical records. They show, in part, the following: drug-abuse treatment, bipolar diagnoses, homelessness, history of mental illness, hearing voices, depression, substance abuse, suicidal ideations, conflict with parents, multiple psychiatric hospitalizations, personality disorder, anxiety, "depressive disorder," "adjustment disorder," multiple suicide attempts, homicidal ideation, schizophrenia or "schizoaffective disorder," hallucinations/delusions, and ADHD.

¶111. Those records include an isolated mention of child molestation. Elsewhere, however, the records say no physical or emotional abuse was suspected. One "Progress Note" specifically says, "[Ronk] denies any history of physical, sexual, emotional abuse or neglect." Moreover, Ronk says nothing in his motion about having been molested as a child. Nor is childhood sexual abuse among the risk factors identified by Dr. James Garbarino, who examined Ronk at post-conviction counsel's request and whose findings are discussed below.

¶112. Another record says Ronk "apparently met a girl on-line," visited her, and she became pregnant. He identifies "seeing his 6[-]month[-]old daughter for the first time" among "[p]reciptiating stressors." Other records, however, say that he has no children, but that one of his former girlfriends did. The possibility of his having a child is further negated by a remark he made to Dr. Garbarino. He told Dr. Garbarino that he had always wanted to be a father, but that he thought it was good he had not become one "because a kid shouldn't have a dad on death row."

¶113. In addition to claiming counsel was ineffective for failing to investigate and obtain or use available records, Ronk alleges counsel was ineffective for failing to hire a qualified expert—more specifically, a mitigation specialist. He claims mitigation specialists are "indispensable in capital cases," and their "requirement" is well settled. As support, he cites a law review article by a federal district court judge that, in turn, cites the 2003 ABA Guidelines, which say, "the capital defense team should consist of at least two attorneys, an investigator, and a 'mitigation specialist.'" Honorable Helen G. Berrigan, *The Indispensable Role of the Mitigation Specialist in A Capital Case: A View from the Federal Bench*, 36

Hofstra L. Rev. 819, 824 (2008) (citing Am. Bar Ass'n, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, Guideline 4.1 Introduction, 31 Hofstra L. Rev. 913, 954–55 (2003), https://bit.ly/2OpruRD). Aside from conducting interviews, amassing information, and culling the information into a presentable form, a primary task for mitigation specialists is to screen for mental-health issues. *Id.* at 827.

¶114. Ronk attacks Dr. Smallwood's merely recounting the contents of her report as insufficient—the data had to be *explained* by a qualified expert. ***Williams***, 529 U.S. at 399 ("[T]he entire postconviction record, viewed as a whole and cumulative of mitigation evidence presented originally, raised 'a reasonable probability that the result of the sentencing proceeding would have been different" if competent counsel had presented and *explained* the significance of all the available evidence.") (emphasis added). In that respect, he likens this case to ***Evans v. State***, 109 So. 3d 1044 (Miss. 2013). In that case, we held that the trial court abused its discretion in denying Evans funds to hire an expert on post-traumatic-stress disorder (PTSD). ***Id.*** at 1045. Evans's defense theory was that PTSD had affected his state of mind at the time of the killing. ***Id.*** at 1048. Although a psychologist (Dr. Smallwood, actually) had been appointed to assess Evans's competency to stand trial, she said she lacked the expertise to explain how PTSD affects a person's mental state. ***Id.*** We reasoned that, in order to present his defense theory, Evans had needed a PTSD expert who could explain PTSD's effects. ***Id.*** at 1048–49.

¶115. As an example of a qualified expert, Ronk offers Dr. Garbarino, a developmental psychologist. At post-conviction counsel's request, Dr. Garbarino interviewed Ronk for two-

and-a-half hours. He prepared a fifteen-page affidavit explaining his findings, summarizing them as follows:

> Ronk is best understood as a troubled child inhabiting a young man's body. His troubled development appears to flow from some combination of temperamental vulnerabilities combined with disrupted family relationships linked to parental rejection. Despite the generally positive family and community environment provided by his adoptive parents, the unresolved issues of his adoption and his reaction to that adoption had a serious negative effect on [Ronk's] emotional life and development. His problems with attachment and a resulting "emotional neediness" and oppositional and defiant behavior flowed from this disconnect and deteriorated in adolescence. This in turn led to chronic maladjustment, substance abuse, and delinquent behavior leading up to the crime for which he was sentenced (to death row). His developmental problems came to fruition during adolescence and early adulthood as very serious issues with identity, socio-emotional immaturity, deceitfulness, substance abuse, and depression.

Ronk emphasizes the statement that he "is best understood as a troubled child inhabiting a young man's body." That statement alone, he says, might have given jurors pause because society does not condone killing children.

¶116. Essential to Dr. Garbarino's analysis are three principles. The first is that "a single risk factor or developmental asset" is rarely, if ever, decisive in child development. A risk factor's impact depends on the larger context; "it is the accumulation of risk factors that tells the story." Second, "[c]hildren differ temperamentally in how and to what degree they will react to and generate particular experiences, including abuse and trauma." Finally, parental rejection is powerful:

> The experience of parental rejection has been found across cultures to lead to disrupted development, an effect so powerful that the most prominent research in this field refers to it as "a psychological malignancy." Cross-cultural research indicates that parental rejection accounts for approximately 25% of the variation in bad outcomes for children and youth.

45

¶117. According to Dr. Garbarino, research shows "adopted children are disproportionately represented in a wide range of developmental issues—ranging from depression to delinquency." For Ronk, "adoption has been the central fact of his life." At age seventeen, he met his biological mother and her family. She told him that she was only sixteen when he was born and that he was conceived as a result of "date rape." The date rape occurred at a church-based program for troubled teens. Her father served as the program's chaplain. After she became pregnant, she and her mom lived in a remote trailer until he was born.

¶118. When Dr. Garbarino asked Ronk about his worst childhood memory, Ronk responded, "When I overheard my parents say they wished they had not adopted me." More specifically,

> [Ronk] reports that at age six he overheard his parents talking about him, and that he heard them say that "I was the biggest mistake in their whole lives." And, "I wish you were never born." And, "I wish we had never adopted you." At age 9, he remembers his mother saying, "the biggest mistake I ever made was adopting you."

Those two comments—wishing that Ronk had not been born or adopted—"combine the two most devastating things any child can hear from a parent," Dr. Garbarino says. And they affected Ronk, giving rise to sadness, manifesting as depression, and rage, manifesting as aggression. Multiple times, he "attacked" his parents, leading them to install dead-bolt locks on their bedroom door. That rage also manifested in Ronk's hostility and resentment toward his biological father, whom he has never met. "If I ever met [my biological dad]," he said, "I would beat the dog piss out of him."

¶119. "For [Ronk]," Dr. Garbarino says, "the idea that both his biological and adoptive mothers 'didn't want [him]' [was] overwhelming."

¶120. Dr. Garbarino discusses a risk-factor assessment, endorsed by the Centers for Disease Control and Prevention, that gives an "Adverse Childhood Experiences" (ACE) score. While not comprehensive, the assessment includes inquiries about "childhood experience of physical, sexual, and psychological maltreatment; poverty; domestic violence; household substance abuse; parental separation or divorce; depression or suicide in a family member; and incarceration of a family member." ACE has proven powerful in accounting for differences in negative outcomes, "accounting for 65% of the variation in suicide attempts, 40% for depressive disorders, and 56% of illicit drug use problems." All three, Dr. Garbarino says, are relevant for understanding many killers' lives.

¶121. Dr. Garbarino says Ronk's ACE score appears to be four. For perspective, "[s]ome 36% of the general population reports an ACE score of zero"; "[s]ome 26% report one"; "[16%] report two"; and "10% report three." "Only 13% report four or more," he says. He identifies four risk factors affecting Ronk's ACE score: (1) "being put down by his parents"; (2) "being physically spanked with a wooden spoon leaving marks"; (3) "feeling rejected and unloved in his family"; and (4) "having a parent with mental health problems (his mom being diagnosed with depression)."

¶122. Dr. Garbarino admits Ronk lacks the "'classic' accumulation" of risk factors common among murderers—e.g., "physical neglect, poverty, domestic violence, parental divorce, parental incarceration, sexual abuse, and parental alcoholism." In Dr. Garbarino's experience, their scores often range from eight to ten. Ronk's "developmental story," in contrast, "appears to be linked to the special issues he faced as an adopted child."

47

¶123. Another assessment Dr. Garbarino cites is the Search Institute's research on "40 Developmental Assets." Weighing such factors as positive elements with family, school, the community, cultural activities, and positive belief systems, the assessment gives "a compelling picture of the role that positive influences and attributes have on pro-social development in general, and upon violent and aggressive behavior in particular." Among youth with thirty-one to forty of those assets, only 6 percent are involved in antisocial aggression, as opposed to 61 percent of youth with zero to ten. Ronk had thirteen assets—four less than the average youth.

¶124. While acknowledging the difficulty of assessing Ronk's temperament during infancy, Dr. Garbarino says the fact that his biological mom did not want him "may have affected his intrauterine experience." His adoptive parents reported "attachment issues" early on. "[Ronk's adoptive parents] explained that he was very uncomfortable being hugged and would run out of the room if physical contact was offered," Dr. Garbarino says.

¶125. Because early, adverse attachment issues often result in developmental harm that is "not readily observable," Dr. Garbarino deems unsurprising that the impact of Ronk's adoption went unrecognized at trial and sentencing. "It appears to have been masked by the apparent normality of his external social life (e.g., participating in church youth groups) and his intellect and early academic success (e.g., IQ testing at 130 and placement in a 'gifted' program in elementary school)," he says.

¶126. Dr. Garbarino says Ronk's childhood problems with attachment and rejection sensitivity extended into adulthood. "[Ronk's] life has been driven by an intense emotional

48

'neediness,'" he says. Ronk's craving for emotional acceptance led him to impulsive, and mostly unsuccessful, relationships. For example, he rushed into marriage with a young woman he met in a drug-rehabilitation program. They separated after only a few weeks, however, because Ronk cheated on her with her best friend. Notably, that account differs from what Ronk told Dr. Smallwood: he told her that he and his wife had separated because she was using drugs and cheating on him. Another example was his relationship with Craite. Ronk described her as "a millionaire, a cougar, and a drunk." He "rushed into a relationship with [her] . . . both because she offered to support him so he could pursue his music and because she offered 'all the sex you could want.'" Sex, Dr. Garbarino explains, offered Ronk a proxy for intimacy. Yet another example of Ronk's impulsivity in relationships was his decision to leave Craite for a woman he met online.

¶127. Dr. Garbarino characterizes the first thirty years of Ronk's life as "an emotional mess" because Ronk struggled emotionally and in making good decisions. "[Ronk] speaks of a lifelong desire to 'fit i[n],' to 'be like everyone else,' 'to have friends,' and 'to be accepted,' that seems to reflect this overall emotional neediness," Dr. Garbarino says. Ronk spoke fondly of the time a therapist accepted him into her family. In addition, he currently is writing a novel that projects his feelings of isolation and rejection.

¶128. Dr. Garbarino also discusses Ronk's struggles with "Attention Deficit Hyperactivity" and depression. Ronk has received counseling since elementary school, although the experiences were neither effective nor all positive. He alleges one therapist grabbed him by the neck; another disclosed confidences to his mom. At school, Ronk's intelligence left him

49

bored: he claimed he would read the textbooks the first few days of school and be bored from then on.

¶129. Dr. Garbarino says Ronk communicated a "chronic pattern of negative behavior toward himself and others that began in childhood and continued through adolescence into adulthood." Such behavior included the following:

> **Substance abuse.** From marijuana at age 11, he progressed to meth at 13 and then cocaine at 17.

> **Self-destructive behavior.** He engaged in "cutting" and "suicidal gestures such as overdosing on pills."

> **Defiance against parents.** At age 15, he embarked on a "master plan to defy [his] parents." He became "a boy at war with his immediate family." His plan included "deliberate academic failure, as well as chronic stealing and lying." In a psychological evaluation conducted at that time, he described his dad as "a perfectionist dictator." And he labeled his younger, adopted sister as a "stuck-up conceited rat." He also expressed homicidal intentions against his mom. Though he had threatened her numerous times before, this time he said he meant it.

> **Defiance against others.** He once broke up with a girl and "left with her car and her dad's guns." And while managing a clothing store, he stole $20,000 in cash.

¶130. Reflecting back, Ronk said he had no moral compass. "I stole from the collection plate at church—I would put in a dollar bill and secretly take out a ten dollar bill."

¶131. Dr. Garbarino adds that Ronk had a long history of psychiatric hospitalizations since age fifteen. At the same time, he notes that Ronk used voluntary hospitalization to alleviate homelessness.

¶132. Dr. Garbarino concludes his affidavit as follows:

> Ronk's behavior in the attack on [Craite] is best understood as the product of developmental disruptions that began in childhood and escalated in adolescence and adulthood, disruptions that created a person who is both

50

extremely "emotionally needy" and in chronic conflict with society. His experience was already "at risk" by virtue of the fact that he was an adopted child. It was undermined significantly by his perception of being rejected by his adoptive parents and compared negatively with his sister, who was also adopted. As [Ronk] put it, "She was the good child and I was the bad child.'' His temperament and attachment issues appeared to have launched him on an increasingly negative path in childhood that became a pattern of chronic alienation, disengagement, anti-social behavior, and substance abuse in adolescence and adulthood, which culminated in the crime for which he is currently incarcerated.

He then adds, "[t]hese issues constitute significant mitigating factors in any informed sentencing decisions . . . and should have been considered in [Ronk's] original sentencing."

¶133. In addition to Dr. Garbarino's affidavit, Ronk offers an affidavit from Dr. Bhushan S. Agharkar. Dr. Agharkar, who interviewed Ronk for about two hours, says it appeared "[Ronk's] history involved one of trauma and abandonment." And "the symptoms [Ronk] reported may be consistent with [b]ipolar [d]isorder or at least a major mood condition." Yet Dr. Agharkar says he needs more time to review Ronk's social history and to conduct more interviews to confirm his clinical suspicions. No supplemental affidavit or report from Dr. Agharkar is provided.

¶134. An affidavit from Ronk's adoptive mother Susan says they provided Ronk "a very stable, structured home." The family attended church, went camping, and took vacations. Early on, they told Ronk he was adopted, and he knew what that meant. When he got older, they took him to meet his biological mother. He learned his mother had been raped. Afterwards, he struggled coming to terms with being adopted. He wrestled with rejection and his feeling that he was "a mistake." Alhough they sought counseling for him beginning in fifth grade, his behavior steadily grew worse as he got older.

¶135. Ronk's biological mother Burrell's affidavit confirms he was conceived as a result of "date rape." She identifies the biological father, but says that she does not know his whereabouts. At age eighteen, Ronk told Burrell he wished she had kept and raised him.

¶136. Ronk argues that if counsel had conducted a mitigation investigation and hired a qualified expert, then counsel could have presented and explained the following:

- "the story of [his] adoption and troubled childhood and adolescence—of his conception out of wedlock as the result of a what he believed was a rape";

- the consequences of his learning of his adoption and his believing he was conceived as the result of rape;

- "his traumatic experiences of feeling rejection, of coming to believe that he was not wanted by either his biological or his adoptive parents";

- "his mental illnesses, and how they exacerbated the effects of trauma";

- "[his] repeated, failed attempts at treatment"; and

- his child-development issues.

Had the jury heard such mitigating evidence, he says, a reasonable probability exists that the result would have been different.

¶137. Arguably, counsel's mitigation investigation was deficient.

¶138. On one hand, we disagree with Ronk in three respects. First, contrary to his assertions, Dr. Smallwood was qualified to provide mitigating evidence. While she did admit that a mitigation study is outside the scope of her practice, she also said some information she uncovered was relevant to mitigation. Unlike *Wiggins*, in which the psychologist's reports "revealed nothing . . . of [the] petitioner's life history," *Wiggins*, 539 U.S. at 523, Dr. Smallwood's report contained information about Ronk's life. In addition, she evaluated his mental-health issues, which Ronk admits is a primary task for mitigation specialists. And

unlike *Evans*, in which Dr. Smallwood admitted lacking expertise about PTSD's effects, she never suggested Ronk's mental-health issues were beyond her expertise.

¶139.  Second, we disagree that counsel did *no* mitigation investigation. They did some. For one, they moved to have Dr. Smallwood evaluate Ronk, in part, "to determine . . . whether or not a psychological evaluation would reveal any migrating circumstances." She spoke with his parents and uncovered information relevant to sentencing. For another, they acquired some records. Pretrial, the trial court granted a continuance to give Dr. Smallwood more time to review "records *from a number of institutions* regarding [Ronk's] past psychological treatment." (Emphasis added.) Later, Geiss referenced a "big binder full" of medical and psychological records. Busby's affidavit shows he acquired records as well. Although they apparently went unused for the most part—in her list of sources, Dr. Smallwood cited records from only one hospital—at least some were obtained.

¶140.  Third, we disagree that the *requirement* of a mitigation specialist is well settled. That is untrue. *Hill v. Mitchell*, 842 F.3d 910, 945 n.15 (6th Cir. 2016) (stating ABA Guidelines do not establish a constitutional right to a mitigation specialist for the sentencing phase); *Honie v. State*, 342 P.3d 182, 194 (Utah 2014) ("[T]rial counsel is not required to hire a mitigation specialist in order to comply with his Sixth Amendment obligations."); *State v. McGuire*, 686 N.E.2d 1112, 1120 (Ohio 1997) (holding that hiring a mitigation specialist is not a requirement for effective assistance). There is no "per se rule that trial counsel is ineffective at mitigation unless a particular type of expert is retained." *Carter v. Mitchell*, 443 F.3d 517, 527 (6th Cir. 2006).

¶141. On the other hand, Dr. Smallwood's report and the records that were obtained arguably would have led a reasonable attorney to investigate further. Her report clearly signaled that more was needed. She said "many variables which may provide mitigation are reportedly found in [Ronk's] psychological and medical history. However, I do not have the benefit of those medical records." So whatever records were in the "big binder" Geiss referenced, Dr. Smallwood either did not get them or they were all from one hospital. Because she lacked his other records, she "highly recommended" that they and "other relevant records be secured and that collateral witnesses be interviewed." What is more, she specifically said her examination was not a mitigation study and recommended that one be done. Counsel, apparently, did not heed her advice. Ronk presents evidence that counsel neither interviewed collateral witnesses nor did counsel conduct a full mitigation study. Susan says that counsel never contacted her or her husband about Ronk's background or contact information for his friends, teachers, church members, or other family members. To her knowledge, Geiss "did not conduct any sort of mitigation investigation." Burrell, likewise, said counsel never contacted her. And Busby says trial counsel "did not develop the mitigation evidence that was available."

¶142. Furthermore, Busby says the records he collected warranted further investigation. They note Ronk's "chronic mental health history"; prior commitment to Whitfield; suicidal ideations and attempts; homelessness; drug abuse; history of behavioral problems dating back to fifth grade; "frontal lobe problems" as a youth; and bipolar-disorder and polysubstance-dependance diagnoses.

54

¶143. Although we find counsel's mitigation investigation arguably was deficient, that satisfies only half the test—he must also make a substantial showing of prejudice. In that regard, we find he falls short.

¶144. The new evidence Ronk provides is mostly cumulative: Dr. Smallwood's testimony and report referenced his adoption; conception as a result of rape; sense of rejection and feeling like a mistake; hearing his parents say they wish he had never been born or that they had not adopted him; substance abuse; mental-health and behavioral issues beginning around age ten; extensive mental-health history and hospitalizations; bipolar-disorder and ADHD diagnoses; suicide attempts; depression; and failed relationships, including a failed marriage.

¶145. To be sure, Dr. Garbarino better explains and connects Ronk's behavior to child-development issues that included his adoption, sense of parental rejection, temperament, and attachment issues. But Dr. Smallwood conveyed many of those things. She explained how his adoption and feelings of being a mistake provoked anger. "[Ronk] apparently had resentment about [his] adoption, feeling that he was a mistake, and he tended to take that anger out on his adoptive parents," she said. In speaking to Dr. Smallwood, Ronk acknowledged that adopted children frequently grapple with rejection issues. "I know that 98 percent of adopted kids have rejection issues," he told her. And in recalling past traumas, he cited learning of his conception's being the result of rape and hearing his adoptive parents say they wished he had never been born.

¶146. Dr. Smallwood attributed Ronk's impulsive, aggressive, and threatening behavior to his bipolar disorder and ADHD. "Ronk had a history throughout his life of impulsive

55

behavior, aggressive and threatening kind of behavior, not thinking before he made decisions, and that is something that certainly, you know, are [h]allmarks of both manic depressive disorder and ADHD," she explained. Later, she added that "the presence of the bipolar disorder and ADHD, which he has, would make it much more difficult for him to control than the average person."

¶147. Ronk's homelife was not horrid. His adoptive mom Susan speaks of their attending church, going camping, and taking vacations. Even Dr. Garbarino says Ronk's adoptive parents provided a "generally positive family and community environment." And without excusing or minimizing the impact of their alleged hurtful comments, Dr. Smallwood's report gives some context to at least one such instance. Ronk says he "caught them on a bad day because [his] breaking a dish pushed them over the edge, and they said [the biggest mistake they made was adopting me, and they wish I wasn't born]." In other words, such comments apparently were not commonplace—otherwise, he could not have had a generally positive family environment.

¶148. Overall, the evidence casts Ronk's adoptive parents as frustrated but still supportive. More than once, he "attacked" them, which led them to install dead-bolt locks on their bedroom door. He admitted devising a "master plan" to defy and oppose them by deliberate academic failure, stealing, and lying. Despite all that, they assisted him in getting into rehabilitation programs and in finding a job. They provided financial assistance and bailed him out of jail. They also housed him for a time and tried to house him several times over the years, but they eventually gave up. In a 2006 medical record, Ronk's adoptive dad said Ronk

could not return to live with them because "we've tried that too many times and it just doesn't work."

¶149. To the extent the new evidence Ronk provides is beneficial, it is equally damaging. On one hand, Dr. Garbarino discusses how Ronk's being an adopted child put him "at risk." And he explains Ronk's above-average ACE score and below-average number of developmental assets. On the other hand, he concedes Ronk lacks the "'classic' accumulation" of risk factors common among murderers—his ACE score is four whereas theirs often ranges from eight to ten. Even Ronk's numerous hospital stays are questionable: Dr. Garbarino says Ronk "used voluntary hospital admission as a way to alleviate issues associated with homelessness." Then there are the bad acts—taking his ex-girlfriend's father's car and guns, stealing a large sum of money from an employer, and removing money from the church offering plate. Maybe most damaging are Ronk's comments about Craite. According to Dr. Garbarino, he called her "a millionaire, a cougar, and a drunk," and said, essentially, that he used her for sex and to support his music career/hobby. Those comments cast him as selfish, manipulative, contemptuous, and unrepentant.

¶150. In sum, Dr. Smallwood covered the basic mitigating evidence supporting Ronk, and nothing offered now is new or different. In reweighing all the aggravating and mitigating evidence, no reasonable probability exists that at least one juror would have struck a different balance. The new evidence merely expounds on or rounds out facts that were presented to the jury. Moreover, this double-edged evidence is nowhere near the magnitude of the undiscovered evidence in cases like *Williams*, *Wiggins*, and *Rompilla*.

> 2. *Counsel was not ineffective for "opening the door" to damaging evidence during the sentencing phase, for eliciting otherwise inadmissible and prejudicial prior-bad-acts evidence from Dr. Smallwood, and for failing to anticipate and/or meet additional non-statutory aggravating evidence the State elicited from her during cross-examination.*

¶151. Mitigation evidence can be double-edged—so much so that counsel, following a constitutionally adequate investigation, may reasonably choose to offer none. *E.g., **Burger v. Kemp***, 483 U.S. 776, 788–95, 107 S. Ct. 3114, 3123, 97 L. Ed. 2d 638 (1987). As part of their investigation, counsel must make reasonable efforts to obtain and review information they know the prosecution will likely use as evidence of aggravation. ***Rompilla***, 545 U.S. at 377. And when choosing a mitigation theory, counsel's investigation should include reasonably discoverable related evidence that could cast an unfavorable light on the defendant. ***Ross***, 954 So. 2d at 1005–06. In ***Ross***, for example, we held that counsel was ineffective, in part, for failing to investigate Ross's disciplinary record as an inmate. ***Id.*** at 1006. As discussed above, one of counsel's primary mitigation theories in that case had been that Ross was a "good prisoner." ***Id.*** at 1005. That opened the door for the State to show he had actually been disciplined for possessing a hacksaw, attempting to escape, and making alcoholic beverages. ***Id.*** at 1005. We deemed that bad-act evidence "highly prejudicial, as it tended to cast Ross as unrepentant, a habitual criminal, and a danger to society." ***Id.*** at 1006. As another example, in ***Hodges*** the United States District Court for the Northern District of Mississippi found that trial counsel was ineffective at sentencing based on numerous errors. ***Hodges***, 2010 WL 3655851, at *39. Among them, counsel called witnesses who opened the door to damaging evidence that included two prior jail escapes, two burglary charges, and

an attempted sexual-battery charge. *Id.* at **34, 36. On cross-examination, counsel did not try to rebut the negative impact of that testimony. *Id.* at *37.

¶152. Yet when the main mitigation theory is mental illness, it can be sound trial strategy to present bad acts as examples of the defendant's struggles with mental illness. ***Woodward v. State***, 843 So. 2d 1, 8–10 (Miss. 2003). In ***Woodward***, defense witnesses testified about Woodward's arrests for stealing cars and attempted murder and about his claim of having conversations with the Devil. *Id.* at 8. In addition, a psychologist noted his prior abusive, violent behavior. *Id.* Through affidavits, however, trial counsel explained that their strategy had been to portray Woodward as "basically a good person," who struggled with good versus evil, strove to do right, but was overwhelmed when he killed the victim. *Id.* at 9.

¶153. Here, Ronk argues that counsel was ineffective at sentencing for opening the door to damaging evidence, eliciting otherwise inadmissible and prejudicial prior-bad-acts evidence, and failing to anticipate or meet additional non-statutory aggravating evidence.

¶154. Dr. Smallwood testified that Ronk's history was "congruent" or "consistent with" bipolar disorder and ADHD. She described his history of "impulsive behavior, aggressive and threatening kind of behavior, not thinking before he made decisions" as "[h]allmarks" of bipolar disorder and ADHD. Counsel elicited additional testimony about a "childhood conduct disorder":

> [Geiss]: Okay. Based upon your interviews and testing did you find that Mr. Ronk had any kind of what we would call a conduct problem, conduct disorder, anything like that?

| [Dr. Smallwood]: | Right. This was not documented in his records, but as I look back to the history that was given it appears that he would have had a conduct disorder in his childhood. |
|---|---|
| [Geiss]: | What with regard to Mr. Ronk would that be? |
| [Dr. Smallwood]: | Well it's -- conduct disorder is not just having a little bad behavior, which a lot of kids have, but, in fact, it's a repetitive and persistent pattern of behavior in which the basic rights of others or age appropriate norms are violated. It can involve aggression to people or animals, it could involve destruction of property, deceitfulness and threat of serious violation of rules, and all of those were present in Mr. Ronk. |

To summarize, Dr. Smallwood said Ronk had "[v]ery severe problems from many, many, many years back," which remain evident today.

¶155. Counsel then delved into whether Ronk's disorders prevented him from controlling his actions:

| [Geiss]: | [T]he bottom line is here would it be fair to say that Mr. Ronk confronted with a stressful situation or a situation in which things are not going his way would be prone to act or make the wrong decision and not really be totally in control of that? |
|---|---|
| [Dr. Smallwood]: | That's a two-part question. |
| [Geiss]: | Yes, it is? |
| [Dr. Smallwood]: | So let me respond to those separately. That he would be prone to act and make the wrong decision. Certainly he would have the vulnerability to do that both based on his -- the diagnosis that I have described and just behavioral habits. Was he -- I think the second part of the question was could he control that. |
| [Geiss]: | Yes, ma'am? |

| [Dr. Smallwood]: | Not totally, but my evaluation did find that he did not have a mental disorder that overpowered his will to the point that he did not know right from wrong. |
|---|---|

¶156. On cross-examination, the State had Dr. Smallwood concede that Ronk had not been "overcome by some kind of organic mental disorder or anything like that," but that he had made "a behavioral choice" when he killed Craite. She also reaffirmed his history of impulsive, aggressive, threatening, manipulative, and, perhaps, unlawful behavior. Further, the State questioned her about Ronk's malingering. She said he had not been completely honest with her. Later, the State asked her about a letter Ronk wrote Hindall while he was in prison awaiting trial. In the letter, he discussed a plan to escape from jail.

¶157. Toward the end of its cross-examination, the State asked Dr. Smallwood if she had an opinion about Ronk's being antisocial:

| [State]: | Does your opinion rise to the level that he would be diagnosed with antisocial personality disorder? |
|---|---|
| [Dr. Smallwood]: | Yes. |
| [State]: | Is that -- pardon my ignorance of the medical terminology, but is a synonym for that diagnosis someone who is sociopathic? |
| [Dr. Smallwood]: | Sometimes that's kind of a lay term that's used when we say antisocial personalities. |
| | . . . . |
| [State]: | . . . So you would diagnosis him as antisocial personality disorder? |
| [Dr. Smallwood]: | Yes. I didn't see that in any of the medical records that I had, but when I look at the behavior as I assessed it I think he does meet those criteria. |

¶158. On redirect, counsel focused on Ronk's possible malingering:

[Geiss]:                I want to specifically ask because [the State] dwelled on it, the malingering test?

[Dr. Smallwood]:    Yes.

[Geiss]:                You took into consideration the fact that he could have been exaggerating or even lying?

[Dr. Smallwood]:    Yes.

[Geiss]:                And that still did not change your diagnosis?

[Dr. Smallwood]:    The diagnosis was made early in his life, and it doesn't change my observations of whether he met the criteria.

[Geiss]:                In other words, he didn't pull the wool over anybody's eyes, did he?

[Dr. Smallwood]:    We knew that he was not being completely truthful.

¶159. In closing arguments, the State noted Dr. Smallwood's testimony that Ronk was able to control his actions and knew right from wrong. Geiss, however, urged jurors to read Dr. Smallwood's report and to consider her testimony:

[Y]ou heard Dr. Smallwood, and I would again urge you when you get back there, you will have her report, and I ask all of you to please read through it carefully. Dr. Smallwood told you basically that . . . Ronk doesn't possess the same tools all of us seem to possess. When he was confronted with a situation his responses are not the same as ours would be. . . . . [Ronk] is not insane. He is just incapable of making what would be in this kind of a situation a rational decision, and acting rationally under the circumstances. Remember what she told you. This is not an imaging thing. We talked to her a lot about what exactly it means to be bipolar because everybody today is bipolar. So that's not true. It's a very small percentage of the population that is truly suffering from this ailment, and that's what it is. It's a defect of the mind. It's a chemical imbalance. And what it does and what it did in the case of . . . Ronk was push him to make all the wrong decisions from the very beginning just as he's

62

probably been making a lot of wrong decisions for most of his life, but it's not something that he wholly controls. If he's fed medications then he's planed out or leveled out or whatever it is that these medications do. I personally still do not understand bipolar disorder fully, but I do understand that it's treated. And if it is not treated it causes problems. Those problems, like Dr. Smallwood told you, cause people that are aggressive or [Ronk] in this case, to act aggressively in a threatening manner and impulsively, and that I would submit to you is what happened here. . . . Ronk acted on impulse, and because he has a chemical imbalance his impulses were all wrong.

¶160. In its rebuttal closing, the State revisited Dr. Smallwood's testimony and report:

[T]he testimony that you heard from Dr. Smallwood, and I submit to you her report is quite telling. And what she told you herself in addition to what's contained in her report likewise is quite telling. Because if you recall when I asked her in cross-examination whether these behavioral problems, behaviors[] that the defendant has exhibited over the course of adolescence and adulthood or his childhood, his impulsive behavior, his manipulation, his aggressive behavior, his inability to conform his behavior to the norms of society, the rules by which everyone in this courtroom must live, his inability over the course of his lifetime to do that. Someone years back diagnosed him as ADHD and bipolar. Well she agreed with me that that's a classic clear example of someone who has antisocial personalty disorders. And in my inability to talk to her on the same level I said is that the same thing as sociopathic, and she agreed. And that's the same kind of recklessness and indifference to the value of human life, impulsiveness that landed us in this courtroom and landed . . . Craite deceased. Take that into consideration please. Don't allow bad childhood to be a crutch.

¶161. Ronk argues that counsel's minimal investigation caused Dr. Smallwood's testimony not only to be weak, but also to be prejudicial. She only had medical records from one institution; without his full medical and psychological treatment history, she was unable to diagnose him—the most she could say was that his behavioral history was *consistent with* bipolar disorder and ADHD. And to show that, she had to discuss "otherwise inadmissible and extremely dangerous information" concerning prior bad acts. For example, she cited his history of impulsive, aggressive, and threatening behavior. Even more damaging, according

63

to Ronk, were the behaviors she associated with his childhood-conduct disorder—a persistent pattern of violating others' rights and age-appropriate norms; aggression towards people or animals; destruction of property; deceitfulness; and the "threat of serious violation of rules." Ronk maintains that none of that would have been admissible had the State offered it to establish his bad character. And to worsen the situation, instead of realizing Dr. Smallwood's limitations, Geiss compounded the damaging information by eliciting from her that Ronk "did not have a mental disorder that overpowered his will."

¶162. With the door opened, the State expanded on Ronk's history of misbehavior. It elicited his law breaking, manipulation of others, and planned escape from jail—a "highly prejudicial" accusation standing alone, Ronk says. What is more, the planned jail escape originated from a letter that was never introduced. Nor had Dr. Smallwood seen it beforehand. The State's cross-examination then culminated with its getting Dr. Smallwood to label Ronk a "sociopath" with "anti-social personality disorder." Those labels, Ronk says, were stronger and more stigmatizing than her earlier opinions that his history was "consistent" or "congruent" with bipolar disorder and ADHD. The labels also supported the State's "heinous, atrocious, and cruel" aggravator.

¶163. Ronk adds that counsel not only opened the door for the State to elicit damaging information on cross-examination, but also failed to object when the State elicited rank speculation. He gives two examples. First, the State asked if Ronk's "violation of norms" included "violation of the law." Dr. Smallwood answered perhaps. Second, it asked if it

64

would "probably be a fair statistic that the overwhelming majority of adopted children don't stab and kill somebody and burn their house." Dr. Smallwood affirmed.

¶164. On redirect, rather than trying to ameliorate the damage, counsel had Dr. Smallwood stand by her opinions even though she knew Ronk was not being candid. Citing *Ferguson v. State*, 507 So. 2d 94, 97 (Miss. 1987), Ronk says a lawyer's endorsing a client's untruthfulness requires reversal.

¶165. Then in closing remarks, Ronk says the State used Dr. Smallwood's testimony to cast him as "an 'evil,' manipulative, exploitative sociopath hiding behind nothing more than a 'bad childhood,' rather than a traumatized, disturbed child who grew up to have a serious mental illness that contributed to his committing the crime." Counsel's closing argument, in contrast, consisted of Geiss's tepidly saying that Ronk lacked normal control due to mental illness and asking jurors "to listen to Dr. Smallwood, read her report, and follow their consciences."

¶166. Ronk likens his case to *Ross*. In *Ross*, an insufficient mitigation investigation led counsel to call mitigation witnesses whose testimony opened the door to damaging, prejudicial information. Ronk also cites *Rompilla*, asserting that "[f]ailure to anticipate damaging evidence that the State is likely to adduce . . . is prejudicial ineffectiveness standing alone."

¶167. We find Ronk fails to make a substantial showing that counsel was ineffective as alleged here.

¶168. Notably, Ronk does not argue that counsel should have presented no mitigating evidence of mental illness or life history; rather, he argues that counsel should have prepared better and known more about Dr. Smallwood's findings in order to realize her limitations and to anticipate the damaging information she would present and open the door to. Had counsel done that, they could have presented the good minus the bad through a more qualified expert—like Dr. Garbarino.

¶169. Counsel surely knew Dr. Smallwood's testimony could have positive and negative effects. Her report gave examples of Ronk's impulsive, aggressive, threatening behavior—e.g., prior crimes; "trouble being around people"; substance abuse; getting into fights; making bomb threats; threatening or fighting his mother; and "a lot of failed relationships." In addition, weeks before trial, the State provided Geiss copies of letters from Hindall. At the same time, however, Dr. Smallwood's report said nothing about a childhood-conduct disorder, antisocial personality disorder, or sociopathy. Nor is it clear if the letters Geiss received mentioned Ronk's jail-escape plan.

¶170. At any rate, counsel's actions were not deficient. The decision to present Ronk's behavioral problems in the context of his mental illness fell within the realm of trial strategy. Of course, those problems were subject to attack once presented. *Hansen v. State*, 592 So. 2d 114, 148 (Miss. 1991) (citations omitted) ("[W]hen the defendant puts mitigating evidence before the jury during the penalty phase, the prosecution is allowed to counter-attack."); *see also Brinkley v. Houk*, 831 F.3d 356, 364 (6th Cir. 2016) (citation omitted) (stating that a testifying psychologist's review of a defendant's history is "fair game" for cross-

examination). As for the sociopath remark, we have held that counsel was not ineffective for relying on an expert psychiatrist who referred to the defendant as a "sociopath with a history of inappropriate conduct as a juvenile." *McGilberry v. State*, 843 So. 2d 21, 31 (Miss. 2003). Antisocial personality disorder has both negative and mitigating connotations. *Morton v. Sec'y, Fla. Dep't of Corr.*, 684 F.3d 1157, 1168 (11th Cir. 2012). As for the jail-escape plan, this case is not like *Ross*. Unlike counsel in *Ross*, counsel here did not advance a "good prisoner" mitigation theory only to be surprised at trial by conflicting evidence. Instead, the State raised the jail-escape plan as permissible rebuttal evidence that provided yet another example of Ronk's inability to abide by societal norms and laws. *Davis v. State*, 660 So. 2d 1228, 1249–50 (Miss. 1995) (citing *Hansen*, 592 So. 2d at 145).

¶171. But even if counsel's performance was deficient in this regard, no prejudice is shown. If Dr. Smallwood—or any expert, for that matter—had studied all Ronk's medical and psychological records and had been able to make a firm diagnosis, the State still could have cross-examined her about the basis for her opinions. *Shaffer v. State*, 740 So. 2d 273, 281 (Miss. 1998) (quoting *City of Laurel v. Upton*, 253 Miss. 380, 393, 175 So. 2d 621, 625 (1965) ("In every case where an expert witness is allowed to express an opinion such witness is subject to cross-examination as to the basis of his opinion."). Ronk asserts she could have testified about his mental illnesses without opening the door to unlimited character evidence. *Woodward v. State*, 635 So. 2d 805, 810 (Miss. 1993) (stating counsel were ineffective for not realizing they could have presented mental-illness testimony without "opening the door to unlimited character evidence"). Even if what Ronk argues is true, Dr. Garbarino's affidavit

shows he would have testified no differently than Dr. Smallwood did. We fail to see how his testimony would not present equivalent bad acts and open the door for the State to present the very same evidence. He speaks of Ronk's "delinquent behavior leading up to [Craite's murder]"; his rage; his attacking his parents; his "impulsive (and largely unsuccessful) efforts to find connection"; his impulsivity; his struggling to make good decisions; his "chronic pattern of negative behavior towards himself and others that began in childhood and continued through adolescence into adulthood"; his defiance toward his parents; his threats to kill his mother; his "deliberate academic failure"; his "chronic stealing and lying"; his taking his girlfriend's dad's car and guns; his stealing from his employer; his stealing from the church collection plate; and his "anti-social behavior." All that shows impulsive, aggressive, threatening, nonconforming, destructive, deceitful, manipulative, and unlawful behavior. The new medical records, too, reference Ronk's threatening his parents; his arrests; and his crimes, including violent crimes (e.g., shoplifting, endangering the welfare of a child, assault, harassment, and theft).

¶172. Finally, *Ferguson* is distinguishable. There, Ferguson and his lawyer had a tumultuous relationship. *Ferguson*, 507 So. 2d at 94. We held "an independent violation of the Sixth Amendment occurred . . . when Ferguson's lawyer denounced him as a liar in open court before the trier of fact, and that th[at] was an evil of such magnitude that no showing of prejudice [wa]s necessary for a reversal." *Id.* at 97. No such circumstances exist here. Geiss was not calling Ronk a liar; he was emphasizing that Ronk's truthfulness, or lack thereof, to Dr. Smallwood was immaterial. He sought to bolster her opinions after the State

had tried to discount them by cross-examining her about Ronk's malingering. Geiss's point was that she knew Ronk was malingering, but her opinions remained unchanged.

### 3. Counsel was not ineffective for failing to discover, put on, and properly explain evidence of Ronk's mental disorders.

¶173. Ronk argues counsel was ineffective for failing to discover, put on, and properly explain evidence of his mental disorders. He says research shows that such evidence significantly affects jurors. An extensive study by the Capital Jury Project, for example, showed that if the jury had known a defendant had a history of mental illness, 26.7 percent of them were "much less likely," and 29.5 percent were "slightly less likely," to vote for death. Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L. Rev. 1538, 1559 (1998). And if they had known a defendant "had been in institutions but was never given any real help," 20.1 percent were "much less likely," and 28.1 percent were "slightly less likely," to vote for death. *Id.*

¶174. We find Ronk fails to present a substantial showing that counsel was ineffective in this regard. Dr. Smallwood said Ronk had symptoms consistent with bipolar disorder and ADHD. And at least three times, she said he had mental disorders. First, in discussing her initial findings, she said, "[h]e did have mental disorders." Second, when asked about his ability to control his impulses, she said "the presence of the bipolar disorder and ADHD, *which he has*" made impulse control much harder for him than the average person. (Emphasis added.) And finally, she affirmed that she would diagnose him with antisocial personality disorder. In addition, she explained the meaning of ADHD and bipolar disorder, noting that true bipolar disorder is rare, affecting .4 percent to 1.6 percent of the population. She also

69

said that Ronk had had "numerous hospital stays over the course of his lifetime" for mental problems.

                    *4.      Counsel was not ineffective for a brief, tepid, and incomplete opening statement and closing argument at sentencing.*

¶175.  Ronk argues that Geiss was ineffective for his "brief, tepid, and incomplete opening statement and closing argument" at sentencing. He says Geiss's opening statement was six sentences (minus "Ladies and gentlemen" and "Thank you") and only 127 words:

> Ladies and gentlemen. You will recall way back Monday when we started this process I talked about them making a decision about whether or not the State should take someone's life. You would want to know as much as possible about that individual, and that is what we're going to try and get across to you today, this morning. we will do that through the testimony of Dr. Beverly Smallwood who was a psychologist -- is a psychologist and conducted an evaluation on Mr. Ronk. I'm not going to belabor what it is. She will testify, you will hear that yourselves. But I do ask that you pay attention because some of it is medicalese. And I will try and make sure that Dr. Smallwood explains that as simply as possible. Thank you.

Ronk insists that Geiss should have erred on the side of saying too much rather than choosing not to "belabor" whatever it was he had in mind. Ronk, again, emphasizes counsel's duty not only to present mitigating evidence, but also to explain it.

¶176.  The State disagrees that Geiss's opening statement was either too brief or ineffective in explaining why death was unwarranted. It says Ronk's insistence that more should have been said is subjective: no mandatory minimum number of sentences or words is required. Opening statements are not even mandatory. Miss. Code. Ann. § 11-7-147 (Rev. 2004) ("[T]he defendant *may* briefly state his case, and the evidence by which he expects to support

70

it.") (emphasis added). Nor is counsel per se ineffective for failing to give any. *Spicer v. State*, 973 So. 2d 184, 197 (Miss. 2007)).

¶177. The State also disputes that Geiss's opening statement was unclear. His point was simple: He was telling the jury that, through Dr. Smallwood, he would provide them the information they needed to decide whether death should be imposed. And he strategically chose neither to detract from that point nor to risk losing the jury's attention by wading into the minutiae.

¶178. We find Ronk fails to present a substantial showing that Geiss's opening statement constituted ineffective assistance. In *Branch v. State*, 882 So. 2d 36, 55 (Miss. 2004), we rejected Branch's argument that counsel was ineffective for giving no opening statement at the sentencing phase. *Branch* cited Section 11-7-147; *Rushing v. State*, 711 So. 2d 450, 458 (Miss. 1998) (holding failure to give an opening statement is not per se ineffective assistance); and *Bell*, 535 U.S. at 701–02 (holding counsel was not ineffective for failing to give a closing statement). Nothing is facially improper about a brief opening statement that simply introduces and orients the jury to the evidence they will hear.

¶179. Ronk adds that Geiss's closing argument was both brief (less than six minutes and only 795 words) and ineffective.

¶180. As for the brevity, Ronk cites *Gray v. State*, 351 So. 2d 1342, 1346 (Miss. 1977). There, this Court held that the trial court abused its discretion in limiting counsel's closing argument in a capital case to twelve minutes. *Id.* at 1346. The Court reasoned that the sentencing stage is "for the purpose of determining whether [the] defendant will live or die

71

and a defendant should be given ample time to fully argue this important question." ***Id.*** The error there, notably, was based on the trial court's limiting the argument.

¶181. As for the substance, Ronk complains about Geiss's saying that Ronk had "forfeited his life" and Geiss's never asking the jury to sentence him to life. Ronk also complains that, for some reason, Geiss spent eighty-six words explaining Ronk was not legally insane. And Geiss never mentioned Ronk's adoption—the central fact of his life, according to Dr. Garbarino. What is more, Geiss told the jury to read Dr. Smallwood's report, but he did not explain what it meant. To the contrary, he said he did not understand it:

> If he's fed medications then he's planed out or leveled out or whatever it is that these medications do. I personally still do not understand bipolar disorder fully, but I do understand that it's treated. And if it is not treated it causes problems. Those problems, like Dr. Smallwood told you, cause people that are aggressive or [Ronk] in this case, to act aggressively in a threatening manner and impulsively, and that I would submit to you is what happened here. . . . Ronk acted on impulse, and because he has a chemical imbalance his impulses were all wrong. But what you've got to consider is whether or not that's enough to put him to death.

Ronk disparages those comments. "It is easy to imagine jurors hearing this and thinking, yes—that is enough," he says.

¶182. Closing arguments fall within the ambit of trial strategy. ***Havard v. State***, 928 So. 2d 771, 796 (Miss. 2006) (citing ***Pruitt v. State***, 807 So. 2d 1236, 1240 (Miss. 2002)). For that reason, we have been "consistently hesitant to vacate a sentence based on closing arguments by defense counsel." ***Havard***, 928 So. 2d at 796. In ***Havard***, counsel's brief closing argument conceded an aggravating circumstance, i.e., the victim's tender age, and did not argue mitigating circumstances beyond telling jurors that mitigating circumstances were "what

[they] [could] find in their souls to lessen the impact of the aggravating circumstances." *Id.* We held that while the closing argument "could have been presented more forcibly," it did not render counsel ineffective. *Id.*; *contra* ***Woodward***, 635 So. 2d at 810 (holding counsel's closing argument was ineffective when counsel admitted Woodward's guilt and said he could not ask the jury to spare Woodward's life other than on "redeeming love," a non-mitigating circumstance).

¶183. Depending on the facts, merely pleading for mercy can be a sound strategic choice. ***Powers v. State***, 883 So. 2d 20, 35 (Miss. 2003) (citing ***Manning v. State***, 735 So. 2d 323, 347–48 (Miss. 1999)).

¶184. We find Ronk fails to present a substantial showing that Geiss's closing argument constituted ineffective assistance. Overall, it was neither deficient nor prejudicial. He told jurors to re-read the instructions and to read Dr. Smallwood's report carefully. He also told them that

- they would not fail to fulfill their oath if they failed to reach a unanimous decision because Ronk had already forfeited his life;

- two of the aggravating factors did not factor into Craites's death;

- Ronk "doesn't possess the same tools all of us seem to possess," so his responses to situations are not the same as others;

- even though Ronk could distinguish right from wrong and, therefore, was not legally insane, he was incapable of acting rationally under the circumstances;

- bipolar disorder is a rare chemical imbalance of the mind;

- Ronk's bipolar disorder pushed him to make a wrong decision here just as it has done his entire life;

73

- Ronk's bipolar disorder caused him to act aggressively and impulsively here;

- they could unanimously sentence him to death, unanimously sentence him to life, or, if unanimity could not be reached, sentence him to "the deprivation of the rest of his life"; and

- they must weigh their decision individually and "stick to their guns" if fellow jurors cannot persuade them otherwise.

Finally, he told the jury to remember their oath and to follow their conscience.

### B. Counsel was not ineffective in the guilt phase.

¶185. Ronk says Geiss's illnesses impaired his performance in the guilt phase as well. He gives two examples.

¶186. First, at one point during the jury-instructions conference, Geiss said he was "at a loss of how to argue the case." And later, he said he was "terribly confused." Not long after that, he said it had been defense counsel's position that the jury would find Ronk guilty of something.

¶187. Second, in his closing argument, Geiss said, "We are hard pressed to tell you this is a good solid self-defense case . . . ." Ronk calls that remark "inexplicable." He insists self-defense was his strongest primary defense. Evidence was presented to support it, and the jury was instructed accordingly. Ronk suggests that illness may have caused that remark: earlier, Geiss had said, "[E]xcuse me I'm short of breath." Regardless, Ronk says the jury's hearing Geiss say the main defense theory was no good surely made a big impression.

¶188. We find Ronk fails to present a substantial showing that Geiss was ineffective during the guilt phase. Geiss's remarks must be considered in context.

74

¶189. The jury-instructions conference began in the late afternoon. Geiss offered instructions on self-defense, imperfect self-defense manslaughter, deliberate-design murder, and heat-of-passion manslaughter. The parties and the trial court discussed at length which were proper. One of Geiss's defense theories was that Craite was murdered before the arson; if so, he argued, Ronk could be guilty of either murder or manslaughter, but not capital murder. The State discredited that theory based on the one-continuous-transaction doctrine, i.e., it did not matter if the arson occurred before, during, or after the killing. The trial court said it was inclined to agree. It added that it understood that "the defense primarily was one of self-defense" and that it saw no evidentiary support for deliberate-design murder. The State then asserted that it did not believe evidence supported imperfect self-defense manslaughter either. Notably, the imperfect self-defense-manslaughter instruction was eventually denied. *Ronk*, 172 So. 3d at 1125–26. When the trial court asked Geiss if he wished to say anything else, he replied, "I'm somewhat at a loss of how to argue the case." At that point, the trial court proposed recessing for the evening, allowing both sides to research further, and reconvening the next morning. In doing so, it voiced uncertainty and said it had "serious concerns" about which self-defense instructions were proper.

¶190. After the jury was excused, the parties and the trial court discussed jury instructions a bit more. Toward the end of that discussion, the trial court tried to pinpoint the unresolved issues. When it asked Geiss if he knew of any additional unresolved instructions, he replied, "No. I'm terribly confused." The court again asked, "Do you know of any others?" He said, "No, ma'am." With that, the court recessed.

¶191. The next morning, the trial court said its research, along with the authorities provided by both sides, yielded "no clear answer." Geiss elaborated on his theory that no continuous course of conduct had occurred. After the trial court discussed several cases in trying to determine if a lesser-included-offense instruction was proper, Geiss interjected as follows:

> Your Honor, perhaps I should point out now that taking away any of the lesser included from the defendant and making it an all or not guilty argument basically takes away from him any defense whatsoever. It's been our position, and I'm sure the jury would find, that, you know, Mr. Ronk is guilty of something. Our argument has just been it is not capital murder, but it could be murder and it could possibly be manslaughter, and that they should be entitled to at least that option, one or the other.

The trial court understood but disagreed that Ronk would be left with no defense. "I believe he still has the defense of self-defense, which as I understand is his primary defense in this case," it said. Still, out of an abundance of caution, it granted a lesser-included-offense instruction on murder and arson.

¶192. We find that Geiss's remarks about being "at a loss" and "terribly confused" do not show deficient performance. The "at a loss" remark probably reflected his frustration amidst a complex debate about which self-defense instructions were proper and what effect the refusal of certain instructions would have on his trial strategy. The trial court itself said that "no clear answer" was apparent. And the "terribly confused" remark was understandable given the nature of the discussion.

¶193. Further, Geiss's comment that the defense believed the jury would find Ronk guilty of something did not constitute deficient performance either. Given the overwhelming evidence, that statement was reasonable.

¶194. In any event, no prejudice is shown. Ronk received not only a self-defense instruction, but also a lesser-included-offense instruction.

¶195. In its closing argument, the State conceded that it did not know exactly what had happened in the bedroom in which Craite died. Still, it discredited Ronk's assertion that he thought Craite was going to retrieve a gun inside the closet, because no evidence of any gun was found inside the bedroom.

¶196. In his closing argument, Geiss touched on self-defense, but emphasized the lesser-included offenses more:

> There is an instruction in here on what is deliberate design which would support murder, and I don't want you -- because the instruction points out don't confuse deliberate design with any kind of premeditation because under the law in the deliberate design part you come up like that. And that basically is what happened here. . . . Ronk in the blink of an eye lashed out when he thought that [Craite] was going to do what to him? And that's another issue. We are hard pressed to tell you this is a good solid self-defense case, but we don't have to prove that. It's rather the State's burden to prove that there was not self-defense, and I don't think they have put up anything that says this was not self-defense. All that we have are what . . . Ronk himself has told everyone from the beginning, and told them over and over again. That [Craite] attacked him, he thought she was going for the shotgun, which he thought was in the bedroom closet, and so he stabbed her. Now that right in and of itself if you think that is what happened takes this immediately out of being a capital crime, we think, and puts it four square on the lesser[-]included offense. Ladies and gentlemen, we would submit to you that is what the evidence shows here.
>
> [W]e can't condone a lot of what . . . Ronk did. On the other hand, I don't think we can find him guilty of a murder for which he risks losing his own life. We knew from the very beginning that [Ronk] was not going to be walking out of the door when this was over, but I would submit to you what the true facts indicate in this case are punishment for lesser[-]included offenses that you have been instructed about. It's that simple, and we ask that you so find.

¶197. We find Geiss's remarks in closing argument do not constitute ineffective assistance of counsel. As stated already, we are hesitant to vacate a sentence based on defense counsel's closing argument. *Havard*, 928 So. 2d at 796. And despite Geiss's comment, the elements instruction for capital murder required the jury to find that Ronk had not acted in self-defense. Ronk received self-defense instructions.

¶198. Whether Geiss should have argued self-defense more forcibly is a matter of trial strategy. And he faced a dilemma. To find Ronk acted in self-defense, the jury had to find he had reasonable grounds to apprehend "a design on the part of [Craite] to kill him or to do him some great bodily harm" and that such danger was *imminent*. Evidence showed that Craite kept two guns in a studio apartment attached to the carport, but no trace of any gun was found in the bedroom where she died. Not only had the State highlighted that in its closing argument, but the trial court had denied Ronk's imperfect-self-defense manslaughter instruction. It was not unreasonable then for Geiss to (a) admit that the self-defense argument was not solid; (b) say that, nevertheless, it remained plausible; and (c) urge the jury to consider the lesser-included offenses of murder and arson—crimes that would at least spare him a death sentence. What is more, under the lesser-included-offense instruction, the jury still had to find that Ronk had not acted in self-defense in order to convict him of murder. Conceivably, then, the jury could have found him not guilty of murder, but guilty of arson only.

## II. Ronk's challenge to the disproportionality of his sentence is barred by the doctrine of res judicata.

¶199. On direct appeal, Ronk claimed his death sentence was "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." *Ronk*, 172 So. 3d at 1148. After considering the facts of Ronk's crime and comparing it to similar cases in which a death sentence was imposed, we held his sentence was neither excessive nor disproportionate:

> The evidence reflects that Ronk stabbed an unarmed victim multiple times in the back, took the time to change clothes and search the victim's house for items of value, poured a trail of gasoline through the victim's house and into the room where the victim lay incapacitated, and left the victim to suffer in the blaze as he fled to another state, seemingly destroying any evidence of his crime. While Ronk contends that his culpability is diminished because he was unaware that Craite was still alive when he committed the arson, his conduct is nevertheless analogous to the [*Tison v. Arizona*, 481 U.S. 137, 157, 107 S. Ct. 1676, 1688, 95 L. Ed. 2d 127 (1987)] Court's example of "the person who tortures another not caring whether the victim lives or dies, or the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim[.]"

*Ronk*, 172 So. 3d at 1148.

¶200. Ronk also argued "Section 99–19–105(3) allows for the arbitrary imposition of the death penalty because it does not require this Court to review cases where death has been imposed to cases where death is sought, but not imposed." *Id.* at 1146. We rejected that argument, stating that we had declined prior invitations to "undertake the overwhelming task of considering all death eligible cases in our review." *Id.* (quoting *Lester v. State*, 692 So. 2d 755, 801–02 (Miss. 1997), *overruled on other grounds by Weatherspoon v. State*, 732 So. 2d 158, 162 (Miss. 1999)). We also said that Ronk had cited no controlling authority

79

requiring us to change our proportionality review. ***Ronk***, 172 So. 3d at 1146 (quoting ***Lester***, 692 So. 2d at 801–02).

¶201. Ronk concedes that disproportionality was addressed on direct appeal; however, he argues that "[a] review of cases with facts meaningfully similar to [his] case dispels the notion that [his] sentence was not 'disproportionate to the penalty imposed in similar cases.'" He asks us to consider cases more factually similar to his, i.e, "cases in which the defendant was accused of a killing and an arson (and sometimes of other crimes as well)."

¶202. Ronk says that since July 2, 1976—the date ***Gregg v. Georgia***, 428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976), ushered in the modern era of capital punishment—thirty-five cases have been before this Court and the Court of Appeals "in which the defendant killed the victim or victims and set a fire in connection with the killing." Of those thirty-five cases, nine resulted in death sentences; twenty-six did not.

¶203. To show that his sentence is disproportionate (and that Mississippi's application of the death penalty is arbitrary and capricious), Ronk discusses six cases that he says had more egregious facts, and sometimes multiple victims, but resulted in sentences less than death:

> ***McIntosh v. State***, 917 So. 2d 78 (Miss. 2005). McIntosh entered his mother's home and struck her and her boyfriend. ***Id.*** at 81. After the boyfriend regained consciousness and confronted McIntosh, McIntosh doused him with fluid and set him and the house on fire. ***Id.*** The boyfriend survived, but he sustained burns to more than half his body; the mother died of smoke inhalation. ***Id.*** McIntosh was sentenced to life without parole for capital murder and twenty years for aggravated assault. ***Id.***

> ***Moss v. State***, 940 So. 2d 949 (Miss. Ct. App. 2006). Moss beat his ex-wife, slashed her throat with a pocketknife, beat her again, put her in her own vehicle, and then set it afire. ***Id.*** at 951. She died of smoke inhalation. ***Id.*** Moss

80

pleaded guilty to murder, kidnapping, grand larceny, and arson, and was sentenced to life, ten years, five years, and three years respectively. *Id.* at 950.

*Franklin v. State*, 23 So. 3d 507 (Miss. Ct. App. 2009). Franklin shot two people and then burned down the house they were in. *Id.* at 509. He was sentenced to two life terms for two counts of murder and twenty years for arson. *Id.*

*Rochell v. State*, 748 So. 2d 103 (Miss. 1999). Rochell killed at least one person and burned the person's house down. *Id.* at 108. He was indicted for two counts of capital murder and one count of arson. *Id.* at 105. He pleaded guilty to one count of murder and arson and was sentenced to life and twenty years respectively. *Id.* at 106.

*Wilson v. State*, 923 So. 2d 1039 (Miss. Ct. App. 2005). Wilson went to his ex-wife's house and shot her and a man who was there. *Id.* at 1040. She survived, but the man died; his body was found inside a burning truck. *Id.* Wilson was sentenced to life for murder, twenty years for aggravated assault, and three years for arson. *Id.*

*Smith v. State*, 897 So. 2d 1002 (Miss. Ct. App. 2004). Smith burned his ex-wife's house down. *Id.* at 1004. She survived, but their grandson died inside of smoke inhalation. *Id.* Smith was sentenced to life for murder. *Id.*

¶204. We find this claim is barred by the doctrine of res judicata. Miss. Code Ann. § 99-39-21(3) (Rev. 2015). On direct appeal, we rejected not only rejected Ronk's disproportionality argument, but also the argument that we should "review cases where death has been imposed to cases where death is sought, but not imposed." *Ronk*, 172 So. 3d at 1146, 1148. Notwithstanding the res judicata bar, we are not obligated to consider all death-eligible cases in reviewing proportionality claims. *Lester*, 692 So. 2d at 801–02; *Batiste v. State*, 121 So. 3d 808, 872 (Miss. 2013) (rejecting a claim that we must consider cases in which the death penalty was not imposed as part of our proportionality review).

81

**III.** **Ronk's challenge to the constitutionality of Mississippi's death-penalty statute either is barred by the doctrine of res judicata or is waived.**

¶205. On direct appeal, Ronk challenged the death penalty on three grounds. *Ronk*, 172 So. 3d at 1146–47.

¶206. First, he argued that Section 99-19-105 (Rev. 2015)—the statute governing our mandatory review of death sentences, including whether the sentence is excessive or disproportionate—is insufficient because it does not require us "to review cases where death has been imposed to cases where death is sought, but not imposed." *Id.* at 1146. We rejected that argument and held that, absent some intervening precedent, "Mississippi's capital sentencing scheme is entirely constitutional." *Id.* (citing *Woodward v. State*, 726 So. 2d 524, 528 (Miss. 1997)).

¶207. Second, he argued that "the death penalty is imposed in a discriminatory manner in violation of the Eighth Amendment and the Equal Protection Clause of the Fourteenth Amendment, in that it is imposed disproportionately against males, indigent defendants, and those accused of killing females." *Ronk*, 172 So. 3d at 1146. We rejected that argument as well, holding that Mississippi's capital-sentencing scheme complies with *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), and its progeny. *Ronk*, 172 So. 3d at 1146–47 (quoting *Underwood v. State*, 708 So. 2d 18, 38 (Miss. 1998)). As for Ronk's equal-protection claim, we said, "[s]tatistical evidence alone is insufficient to prove discrimination." *Ronk*, 172 So. 3d at 1147 (citing *McCleskey v. Kemp*, 481 U.S. 279, 292–97, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987)). Instead, "the defendant must show 'that the decisionmakers in his case acted with discriminatory purpose.'" *Ronk*, 172 So. 3d at 1147

82

(quoting *McCleskey*, 481 U.S. at 292). Ronk, however, "provide[d] no evidence that his sentencing jury acted in a discriminatory manner . . . ." *Ronk*, 172 So. 3d at 1147.

¶208. Finally, we rejected his claim that the "'heinous, atrocious, or cruel aggravator' is unconstitutionally broad and vague." *Id.* at 1147.

¶209. Here, Ronk argues that Mississippi's death-penalty statute is unconstitutional because "the death penalty, as applied, is inherently arbitrary and capricious, despite all efforts to eliminate unfairness." He draws heavily from Justice Breyer's dissent in *Glossip v. Gross*, 135 S. Ct. 2726, 2755–2780, 192 L. Ed. 2d 761 (2015) (Breyer, J., dissenting). There, Justice Breyer discussed inexplicable discrepancies when death is imposed. *Id.* at 2763. And he noted that imposition of the death penalty depends heavily on geography, even within death-penalty states. *Id.* at 2761.

¶210. Following Justice Breyer's lead, Ronk says that since October 1976, 57 of Mississippi's 82 counties have accounted for all 213 death sentences. Of those 57 counties, 9 account for almost half of all death sentences. And Harrison County, in which Ronk was convicted and sentenced, has had the most death sentences—29.

¶211. Justice Breyer also noted the impact of race and gender. *Id.* at 2760. A study by the United States Government Accountability Office (GAO), for example, found that "individuals accused of murdering white victims, as opposed to black or other minority victims, are more likely to receive the death penalty." *Id.* at 2760. Ronk says the same is true for Mississippi: of the 250 victims since 1976, 182 were white (72.8 percent) (including the victim here); 55 black (22 percent); 7 Asian (2.8 percent); 5 unknown (2 percent); and 1

Hispanic (.4 percent). Yet according to the United States Department of Justice and the Wall Street Journal, approximately 70 percent of homicide victims in Mississippi are black. "These statistics," Ronk says, "strongly suggest that a defendant who is convicted of the capital murder of a white person is much more likely to receive the death penalty than when the victim is a person of color."

¶212. Because Ronk challenged the constitutionality of Mississippi's capital-sentencing scheme on direct appeal, we find this claim is barred by the doctrine of res judicata. Miss. Code Ann. § 99-39-21(3) (Rev. 2015). Ronk, of course, did not advance these specific arguments on direct appeal. Generally, "[t]he doctrine of res judicata 'bars all issues that might have been (or could have been) raised and decided in the initial suit, plus all issues that were actually decided in the first cause of action.'" *Pierce v. Pierce*, 132 So. 3d 553, 560 (Miss. 2014) (quoting *Little v. V & G Welding Supply, Inc.*, 704 So. 2d 1336, 1337 (Miss. 1997)). But Section 99-39-21(3) says the doctrine applies to issues "*decided* at trial and on direct appeal." (Emphasis added.) At any rate, even if res judicata does not apply, the claim is waived. Miss. Code Ann. § 99-39-21(1) (Rev. 2015). While claims may be excepted from the waiver bar "upon a showing of cause and actual prejudice," Miss. Code Ann. § 99-39-21(1), Ronk cannot show either.

¶213. We have held that statistical evidence is insufficient to establish that Mississippi's death-penalty scheme is applied in an irrational, discriminatory manner in violation of either the United States or Mississippi Constitutions. *Galloway v. State*, 122 So. 3d 614, 680–81

(Miss. 2013). Instead, defendants or petitioners must show "the decision makers in [their] case acted with discriminatory purpose." *Id.* at 681 (citing *McCleskey*, 481 U.S. at 292).

¶214. In addition, Justice Breyer's dissent in *Glossip* is not the law. The Supreme Court has not held that capital punishment is unconstitutional. Under the Supremacy Clause, we "cannot interpret the federal Constitution to be more restrictive than has the Supreme Court on issues that Court has directly addressed." *State v. Bush*, 423 P.3d 370, 392–93 (Ariz. 2018) (citations omitted). Nor can we anticipate what the Supreme Court may decide in the future. *Id.* at 393 (citations omitted). So no basis supports our declaring that Mississippi's capital scheme violates the United States Constitution. *See id.*

## IV. Ronk's cumulative-error claim lacks merit.

¶215. The cumulative-error doctrine "holds that individual errors, which are not reversible in themselves, may combine with other errors to make up reversible error, where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial." *Ross*, 954 So. 2d at 1018 (citing *Byrom v. State*, 863 So. 2d 836, 847 (Miss. 2003)). "[R]elevant factors to consider in evaluating a claim of cumulative error include whether the issue of innocence or guilt is close, the quantity and character of the error, and the gravity of the crime charged." *Ross*, 954 So. 2d at 1018 (citation omitted). In capital cases, "the aggregate effect of various errors may create such an atmosphere of bias, passion and prejudice that they effectively deny the defendant a fundamentally fair trial." *Woodward v. State*, 533 So. 2d 418, 432 (Miss. 1988) (citing *Stringer v. State*, 500 So. 2d 928, 939 (Miss. 1986)), *vacated in part*, 635 So. 2d 805 (Miss. 1993).

85

¶216. Ronk argues that even if doubt exists about whether one error among the litany he alleges requires reversal, the cumulative effect of them all does. He maintains that the errors are both numerous and involve significant violations of his constitutional rights.

¶217. Having found that Ronk's claims are all either barred or fail to present a substantial showing of the denial of a state or federal right, we find that this claim lacks merit.

## V. Ronk's claim that trial counsel failed to preserve the record for review is waived.

¶218. "[A] defendant has no right to a 'petit jury composed in whole or in part of persons of [the defendant's] own race,' [but] he or she does have the right to be tried by a jury whose members are selected by nondiscriminatory criteria." *Powers v. Ohio*, 499 U.S. 400, 404, 111 S. Ct. 1364, 1367, 113 L. Ed. 2d 411 (1991) (internal citation omitted). The State cannot exclude potential jurors based solely on race. *McFarland v. State*, 707 So. 2d 166, 171 (Miss. 1997) (citing *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S. Ct. 1712, 1719, 90 L. Ed. 2d 69 (1986)). Under *Batson*, if a defendant objects to a peremptory strike, he or she must first "make a *prima facie* showing that race was the criteria for the . . . strike." *McFarland*, 707 So. 2d at 171 (citing *Batson*, 476 U.S. at 96–97). The burden then shifts to the State to offer a race-neutral explanation. *McFarland*, 707 So. 2d at 171 (citing *Batson*, 476 U.S. at 97–98). The court must then decide if the defendant has met his or her burden of proving purposeful discrimination. *McFarland*, 707 So. 2d at 171 (citing *Batson*, 476 U.S. at 98).

¶219. The venire's, empaneled jury's, and community's racial composition are relevant factors in determining whether a *Batson* violation occurred. *Corrothers v. State*, 148 So. 3d 278, 308 (Miss. 2014) (quoting *Strickland*, 980 So. 2d at 917); *see also Camper v. State*,

24 So. 3d 1072, 1076 (Miss. Ct. App. 2010) ("When considering a *Batson* objection, the trial court should consider the racial composition of the entire venire panel, the jurors considered for service, and the jurors and alternates who actually served."). At the same time, an analysis of the venire's and the jury's racial composition is not required: "The focus of the *Batson* inquiry is on the purposeful discrimination in a party's use of peremptory challenges, not on the ultimate racial composition of the jury." *Berry v. State*, 728 So. 2d 568, 572 (Miss. 1999) (citing *Sudduth v. State*, 562 So. 2d 67, 71 (Miss. 1990)).

¶220. Ronk says that, "[u]pon information and belief, the jury in [his] case was all white with one African-American male as an alternate." Counsel did not object to the State's four strikes for cause and eight peremptory strikes. Counsel did not object to any. But because trial counsel did not preserve a record of the venire's racial composition, "[n]either appellate counsel nor post-conviction counsel could compare the percentage of African-American venire members struck with the percentage of white venire members struck, or even determine the percentage of African-Americans in the jury venire itself." This lack of record, Ronk argues, leaves an incomplete picture of the trial proceeding and renders a meaningful post-conviction proceeding impossible.

¶221. Ronk cites *Chapman v. State*, 167 So. 3d 1170, 1173 (Miss. 2015), and *Brown v. State*, 187 So. 3d 667, 671 (Miss. Ct. App. 2016), as support. In *Chapman*, Chapman was serving a life sentence for rape. *Chapman*, 167 So. 3d at 1171. He had never had a direct appeal, and his numerous motions for post-conviction relief had been denied on procedural grounds. *Id.* at 1171–72. As a result, no appellate court had addressed the merits of his

87

claims, which included an alleged *Batson* violation. *Id.* at 1171. He asserted that the trial transcript and record had been destroyed, making it impossible to address the merits. *Id.* at 1172–73. We held that under the "extraordinary circumstances" of that case—the "lack of a direct appeal, lack of a court record, his attorney's alleged failure to obtain a transcript, lack of appellate review of the merits of his claims"—Chapman was entitled to an evidentiary hearing. *Id.* at 1174. In *Brown*, Brown, who had pleaded guilty, claimed in part that counsel was ineffective. *Brown*, 187 So. 3d at 670. In determining whether that claim was barred, the Court of Appeals cited *Chapman* as an instance in which this Court had excepted an ineffective-assistance claim from the procedural bars due to "trial counsel's failure 'to ensure [the] defendant c[ould] adequately appeal his conviction.'" *Brown*, 187 So. 3d at 671 (citing *Chapman*, 167 So. 3d at 1173–74). Ultimately, the Court of Appeals held that the record showed the ineffective-assistance claim had no basis and was thus time barred. *Brown*, 187 So. 3d at 671–73.

¶222.  We find this issue is waived. A trial objection is required to preserve a *Batson* claim for appeal. *Thomas v. State*, 517 So. 2d 1285, 1287 (Miss. 1987). Even in capital cases, "a party who fails to object to the jury's composition before it is empaneled waives any right to complain thereafter." *Keller v. State*, 138 So. 3d 817, 842 (Miss. 2014) (quoting *Duplantis v. State*, 644 So. 2d 1235, 1245 (Miss. 1994)); *see also Shaw v. State*, 540 So. 2d 26, 27 (Miss. 1989) (holding that any challenge to the jury's racial composition was waived when *Batson* was not raised during the jury-selection process and the record was silent on the venire's racial composition). While not binding here, several federal circuit courts of appeals

have held a *Batson* claim cannot be asserted in a habeas petition if the petitioner did not object to the peremptory challenges at trial. *Haney v. Adams*, 641 F.3d 1168, 1171, 1171 n.6 (9th Cir. 2011) (citing *McCrory v. Henderson*, 82 F.3d 1243, 1247 (2d Cir. 1996); *Abu–Jamal v. Horn*, 520 F.3d 272 (3d Cir. 2008), *vacated on other grounds by Beard v. Abu–Jamal*, 558 U.S. 1143, 130 S. Ct. 1134, 175 L. Ed. 2d 967 (2010); *Allen v. Lee*, 366 F.3d 319, 327–28 (4th Cir. 2004); *Thomas v. Moore*, 866 F.2d 803, 804 (5th Cir. 1989); *Carter v. Hopkins*, 151 F.3d 872, 875–76 (8th Cir. 1998); *Sledd v. McKune*, 71 F.3d 797, 799 (10th Cir. 1995)).

¶223. Notwithstanding the waiver bar, Ronk fails to present a substantial showing that the lack of record denied him a state or federal right. This case is not like *Chapman*, in which no trial transcript or record was made. Furthermore, *Walker v. State*, 863 So. 2d 1, 28 (Miss. 2003), says counsel is not required to preserve a record of the jury's racial composition.

¶224. *Wilcher v. State*, 863 So. 2d 776 (Miss. 2003), is especially insightful. There, we rejected Wilcher's claim that counsel was ineffective for failing to object to the State's use of peremptory challenges to exclude all five African-American venire members. *Wilcher*, 863 So. 2d at 819. We noted the record was silent on the racial composition of the venire, making it impossible for us to determine if a *Batson* challenge was warranted, and if so, whether counsel's failure to make such challenge caused prejudice. *Id.* But we said even if the State had indeed struck all five African-American venire members, Wilcher still failed to show prejudice. *Id.* at 820. We explained that while defendants have a right to be tried by a jury selected based on nondiscriminatory criteria, the Constitution does not require the jury

to "mirror the community and reflect the various distinctive groups in the populations." ***Id.*** (quoting ***Simon v. State***, 688 So. 2d 791, 806 (Miss. 1997)).

## CONCLUSION

¶225. Because Ronk's claims are either barred or fail to present a substantial showing of the denial of a state or federal right, his Motion for Leave to Proceed in the Trial Court with a Petition for Post-Conviction Relief is denied.

¶226. **LEAVE TO SEEK POST-CONVICTION RELIEF DENIED.**

**RANDOLPH, P.J., MAXWELL, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR. COLEMAN, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, P.J., AND KING, J.**

**COLEMAN, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶227. While I concur with the majority's analysis and conclusions on all other issues, I would grant Ronk's motion to proceed with his petition for post-conviction relief on the sole issue of whether his counsel was ineffective during the sentencing phase of trial. Therefore, I dissent in part.

¶228. The majority notes that, "Arguably, counsel's mitigation investigation was deficient[,]" but concludes that Ronk in not entitled to relief because he has not made a substantial showing that he was prejudiced by the deficiencies. Maj. Op. ¶¶137, 143. However, the majority downplays the issues with the mitigation investigation and subsequent presentation.

¶229. According to the majority, Dr. Smallwood's testimony was sufficient as to mitigation because she uncovered "some information . . . relevant to mitigation." Maj. Op. ¶ 138. Dr.

Smallwood was not asked to conduct a mitigation study, and she testified specifically that she had not done a mitigation study. Dr. Smallwood's own report stated

> It must be noted that many variables which may provide mitigation are reportedly found in this man's psychological and medical history. However, I do not have the benefit of those medical records. It is highly recommended that these and other relevant records be secured and that collateral witnesses be interviewed. The present examination is not a mitigation study, which is outside of the scope of my current practice . . . . However, as noted, a mitigation study is recommended.

The majority also disagrees with Ronk's contention that *no* mitigation investigation occurred–"They did some." Maj. Op. 139. The majority again relies on Dr. Smallwood's evaluation as evidence of the mitigation investigation, but as discussed above, Dr. Smallwood did not consider her evaluation of Ronk to be a mitigation study. The majority acknowledges that "Dr. Smallwood's report and the records that were obtained arguably would have led a reasonable attorney to investigate further. *Her report clearly signaled that more was needed*." Maj. Op. ¶ 141 (emphasis added).

¶230. However, in spite of Dr. Smallwood's repeated attempts to convey that her evaluation was not a mitigation study and that Ronk's history warranted a mitigation study, Ronk's counsel, and now the majority, consider her testimony and report to be good enough. I am not persuaded by the majority's "good enough" approach. Ronk has submitted affidavits from his adoptive mother, his biological mother, and a member of his trial attorney team, and all the affidavits indicate that Ronk's adoptive parents, friends, teachers, church members, family members, or medical professionals were not interviewed. While the majority would find that the medical evidence Ronk submitted is "mostly cumulative," given the lack of

91

meaningful investigation and the extent of Ronk's mental history that was not explored or presented to the jury, I cannot agree.

¶231. Mississippi Code Section 99-39-27(5)-(6) (Rev. 2015) provides that the Court is empowered to grant a petitioner leave to proceed on his motion for post-conviction relief in the trial court if there is a "substantial showing of the denial of a state or federal right . . . ." Recently, in *Keller v. State* 229 So. 3d 715 (Miss. 2017), the Court granted Jason Lee Keller's motion for leave to proceed with his petition for post-conviction relief. Keller argued that his trial attorneys were ineffective for failing to investigate, collect, and present mitigation evidence. Keller provided affidavits from family, friends, acquaintances, former teachers and classmates, attorneys, and physicians to demonstrate the mitigation evidence that an effective counsel would have discovered and presented during Keller's sentencing. The Court acknowledged that "Keller specifically points to the failure of trial counsel to obtain a mitigation expert, even though Dr. Beverly Smallwood, a psychologist, who evaluated Keller for the circuit court before trial, recommended doing so." *Id.* at 716.

¶232. For the above reasons discussed and due to the similarities between the instant case and *Keller*, Ronk has presented a substantial showing that a denial of a state or federal right may have occurred. I would grant his motion for leave to proceed with his petition for post-conviction relief in the circuit court on the sole issue of ineffective assistance of counsel during the sentencing phase.

**KITCHENS, P.J., AND KING, J., JOIN THIS OPINION.**